

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**07/31/2009**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **ENERGY PARTNERS, LTD., et al.,** | § | **Case No. 09-32957-H4-11** |
| | § | |
| **Debtors**. | § | |
| | § | |

**MEMORANDUM OPINION ON: (1) EMERGENCY APPLICATION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF TUDOR PICKERING HOLT & CO. SECURITIES, INC. AS VALUATION CONSULTANT FOR THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS *NUNC PRO TUNC* TO JUNE 30, 2009; AND (2) EXPEDITED APPLICATION FOR AN ORDER TO RETAIN AND EMPLOY HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. AS FINANCIAL ADVISORS TO THE OFFICIAL COMMITTEE OF UNSECURED NOTEHOLDERS OF ENERGY PARTNERS, LTD., ET AL., NUNC PRO TUNC TO THE EFFECTIVE DATE**
[Docket Nos. 304 & 309]

## I. INTRODUCTION

Oblivious to recent congressional and public criticism over executives of publicly-held corporations who are paid monumental salaries and bonuses despite running their companies into the ground, two investment banking firms now come into this Court requesting that they be employed under similarly outrageous terms. They do so because two committees in this Chapter 11 case have filed applications to employ these investment banking firms to perform valuation services even though two other independent firms have already performed similar valuations. These investment bankers, who wish to have their fees and expenses paid out of the debtor's estate, have sworn under oath that they will render services only if they immediately receive a nonrefundable fee aggregating $1.0 million. This Court declines the opportunity to endorse such arrogance. The purse is too perverse.

The committees' request to hire the most expensive investment bankers at virtually nondisgorgable and astronomically high fees is tantamount to a debtor chartering a private jet to travel to a meeting of creditors.  While this hypothetical debtor may well need transportation in order to attend the meeting, just as the committees in the case at bar may legitimately believe they each need an independent valuation consultant, both have requested the most inordinately expensive means by which to achieve their objectives.   To approve such a request runs contrary to a fundamental principle of bankruptcy: that a debtor and all professionals associated with the case should act with a measure of frugality in order to preserve the estate's assets and thereby maximize the chances for a successful reorganization.  As one bankruptcy court has noted:

> The Court is willing to award fees for diligence, experience, skill and results. The result obtained is a major factor in awarding professional fees. The main goal of Chapter 11 apart from a successful reorganization of a debtor is a maximum distribution to the creditors of the estate. Ultimately, that is the benchmark against which success or failure must be judged. More often than not, a debtor is experiencing serious financial difficulty, if not near a point of total collapse. The bankruptcy estate is distinct from all other nonbankruptcy clients. It is not principally to serve as a fund for payment of professional fees. It is finite, rarely expands over time, possesses limited cash and usually has diminishing prospects despite high expectations. The estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought.

*In re Chas. A. Stevens & Co.*, 105 B.R. 866, 871-72 (Bankr. N.D. Ill. 1989).

It is noteworthy that excessive and unwarranted expenditures and "spare no expense" attitudes are what frequently land companies in bankruptcy in the first place.  To countenance such practices in this case while the debtor entity—indeed, a publicly-held entity—struggles to reorganize in Chapter 11 would undermine the integrity of the bankruptcy process.

On July 16, 2009, the Court made an oral ruling on the record regarding the two applications that had been filed requesting the absurd payment terms. Specifically, the Court issued its ruling on: (1) the "Emergency Application of the Official Committee of Equity Security Holders for Entry of an Order Authorizing the Employment and Retention of Tudor Pickering Holt & Co. Securities, Inc. as Valuation Consultant for the Official Committee of Equity Security Holders *Nunc Pro Tunc* to June 30, 2009" (the Tudor Pickering Application), [Docket No. 304]; and (2) the "Expedited Application for an Order to Retain and Employ Houlihan Lokey Howard & Zukin Capital, Inc. as Financial Advisors to the Official Committee of Unsecured Noteholders of Energy Partners, Ltd., et al., Nunc Pro Tunc to the Effective Date" (the Houlihan Lokey Application), [Docket No. 309], (collectively, the Applications).

The Court now memorializes its oral findings of fact and conclusions of law with the written findings of fact and conclusions of law set forth herein.[1] To the extent that this Court's oral findings of fact and conclusions of law conflict, or are inconsistent with, any of the written findings of fact and conclusions of law set forth herein, the latter shall govern. Further, to the extent that these written findings of fact and conclusions of law do not memorialize all of the oral findings of fact and conclusions of law, then those oral findings of fact and conclusions of law not memorialized are incorporated herein as if fully set forth in writing so long as they do not conflict, or are inconsistent, with the written findings of fact and conclusions of law.

---

[1] While this Court addressed a number of legal issues in its oral ruling on July 16, 2009, this Memorandum Opinion addresses solely the following issues: (1) the reasonableness of the compensation that the committees propose to pay their respective investment banking firms under 11 U.S.C. § 328; and (2) the propriety of paying these professionals out of the Debtor's cash collateral under 11 U.S.C. §§ 361 and 363.

The Court makes these findings of fact and conclusions of law pursuant to Federal Bankruptcy Rules 7052 and 9014.[2] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. FINDINGS OF FACT

On May 1, 2009, Energy Partners, Ltd. (the Debtor), a publicly-held entity in the oil and gas industry, filed a voluntary Chapter 11 petition on behalf of itself and its affiliated entities.[3] [Docket No. 1.] Eleven days thereafter, the Debtor filed an Expedited Application for Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment and Retention of Parkman Whaling LLC as Financial Advisors for the Debtors, *Nunc Pro Tunc* to the Petition Date (the Application to Employ Parkman Whaling). [Docket No. 122.] In its Order granting the Application to Employ Parkman Whaling, the Court expressly approved the terms of the engagement letter between the Debtor and Parkman Whaling. The amount of monthly compensation that this Court approved is $75,000.00, plus expenses.[4] The professional services that Parkman Whaling LLC (Parkman Whaling) has provided include, among other things, developing an enterprise valuation of the Debtor.

---

[2] Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" or "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

[3] The other debtor entities include Delaware EPL of Texas, LLC; EPL of Louisiana, L.L.C.; EPL Pioneer Houston, Inc.; EPL Pipeline, L.L.C.; and Nighthawk, L.L.C.

[4] Parkman Whaling is also entitled to certain fees under the engagement letter, but these fees are contingent upon certain events actually occurring. For example, Parkman Whaling is entitled to recover 10% of any break-up fee received by the Debtor in connection with any transaction.

On May 27, 2009, the Court issued an Order Granting Motion to Establish Procedure for Monthly and Interim Compensation and Reimbursement of Expenses for Case Professionals (the Procedure for Professionals Order). [Docket No. 173.] Pursuant to the Procedure for Professionals Order, all professionals retained by the estate in these jointly administered cases may seek interim compensation on a monthly basis, subject to (a) a 20% holdback of monthly fees incurred, (b) any party-in-interest's right to object to the compensation sought, and (c) the obligation to file quarterly fee applications. [Docket No. 173, pp. 2-3.] The Procedures for Professionals Order operates in conjunction with the Agreed Final Order (I) Authorizing the Debtors' Use of Cash Collateral and (II) Granting Adequate Protection issued by this Court on June 11, 2009 (the Cash Collateral Order). [Docket No. 220.] The Cash Collateral Order contains a budget, which is set forth on Exhibit A attached to the Cash Collateral Order, which must be strictly complied with (the Budget).  This Budget provides that for the period July 13, 2009 through July 31, 2009, the maximum amount of cash collateral that may be used to pay consultants—a category which includes investment banking firms—is $84,000.00. [Docket No. 220, Ex. A.]

The Office of the United States Trustee has appointed an Official Committee of Unsecured Noteholders (the Unsecured Noteholders' Committee),[5] [Docket No. 193], and an Official Committee of Equity Security Holders (the Equity Holders' Committee)[6] [Docket No. 268].

On May 15, 2009, the Debtor filed its initial Disclosure Statement. [Docket No. 134.] Birch Run Capital, LLC (Birch Run) thereafter filed its Objection to this Disclosure Statement.  [Docket

---

[5] The Unsecured Noteholders' Committee is comprised of the following members: Wexford Capital, LP (as investment advisor to Wexford Funds); The K2 Principal Fund, LP; Carlson Capital LP; Third Point LLC; Farallon Capital Management LLC; and Whitebox Advisors.

[6] The Equity Holders' Committee consists of the following members: Birch Run Capital Partners, LP; High Energy, LLC; and Michael G. Thompson Family Properties, LLC.

No. 209.]  Birch Run owns stock in the Debtor and is a party-in-interest, which will apparently participate in the plan confirmation process.  [Docket No. 222, p. 84.]  Among other things, Birch Run objects to Parkman Whaling's valuation of the Debtor and has argued that since Parkman Whaling's March 31, 2009 valuation, the spot price of oil has increased and forward price curves for both oil and natural gas have increased significantly; therefore, according to Birch Run, Parkman Whaling's valuation is too low and out-dated.  [Docket No. 209, ¶ 3-5.]

On June 11, 2009, the Debtor filed its Second Amended Joint Plan of Reorganization (the Second Amended Plan), [Docket No. 223], and its Second Amended Disclosure Statement (the Second Amended Disclosure Statement), [Docket No. 222]. Under the Second Amended Plan, Class 9 - EPL Other Equity Interests will be "cancelled" and equity holders with interests in that class will "not receive or retain any property or interest in property on account of their EPL Other Equity Interests." [Docket No. 223, pp. 22-23.]

This Court has approved the Second Amended Disclosure Statement and has set the confirmation hearing for July 29, 2009. [Docket No. 231.] The Second Amended Disclosure Statement references two valuation reports for the Debtor's assets: (1) the Parkman Whaling report; and (2) the Birch Run report.  Parkman Whaling's enterprise valuation of the Debtor ranges "from $576 million to $671 million, with a midpoint of $624 million." [Docket No. 222, p. 77.]  Parkman Whaling has also concluded that no residual value is available for the eligible equity interests. [Docket No. 222, p. 76.]  Parkman Whaling has listed in its appraisal of the Debtor a "realizable value for the New EPL [i.e. the Reorganized Debtor] Common Stock of $499 million." [Docket No. 222, p. 77.]  Although the Debtor vehemently disagrees with the Birch Run valuation, [Docket No. 222, pp. 89-90], Birch Run's alternative valuation analysis is included in the Second Amended

6

Disclosure Statement pursuant to a ruling from this Court. [Docket No. 222, pp. 84-89.] According to Birch Run's valuation report, "the current EPL Common Shares are estimated to be worth in excess of $212 million" whereas "Parkman Whaling estimates the current value of these interests at zero ($0)." [Docket No. 222, p. 88.]   The Debtor states in the Second Amended Disclosure Statement that "the closing share price for EPL Common Stock Interests on June 8, 2009 was $0.12 per share, for a total market capitalization of approximately $3.85 million or an amount approximately $208 million less than the equity value asserted by Birch Run." [Docket No. 222, pp. 89-90.] Thus, these two reports reflect a clear and distinct disagreement over the value of the Debtor's common stock.

On July 13, 2009, the Equity Holders' Committee filed the Tudor Pickering Application. [Docket No. 304.]  The proposed fee terms in the Tudor Pickering Application are as follows: (a) a nonrefundable advisory fee of $500,000.00 payable pursuant to the Court's Procedure for Professionals Order; (b) a nonrefundable expert witness fee of $25,000.00 per day, payable each day that a Tudor Pickering Holt & Co. Securities, Inc. (Tudor Pickering) employee is requested, and made available, for the purpose of deposition or testimony; (c) a nonrefundable extended assignment fee of $100,000.00 per month, payable beginning September 1, 2009, and each month thereafter; and (d) any out-of-pocket expenses.[7] [Docket No. 304, ¶ 13.] According to the Tudor Pickering Application, the services Tudor Pickering will render to the Equity Holders' Committee include, but

_____

[7] Although the Tudor Pickering Application suggests that Tudor Pickering will receive compensation pursuant to the terms of Procedure for Professionals Order, the testimony and arguments made at the July 15, 2009 hearing on this application indicate just the contrary.  The Procedure for Professionals Order requires that professionals submit applications to this Court for approval, whereas at the hearing, the testimony of witnesses and representations made by counsel emphasized Tudor Pickering's insistence that the $500,000.00 fee, the $100,000.00 fee, and the $25,000.00 per day fee for an expert's testimony would be non-contingent and nondisgorgable—in other words, Tudor Pickering seeks to avoid having to comply with the Procedure for Professionals Order already in place.

are not limited to, the following: (a) analyzing the Debtor's assets and liabilities, the valuation of the Debtor's businesses and objecting to the plan of reorganization; (b) attending meetings and negotiating with representatives of the Debtor and creditors; (c) assisting in the review, analysis, and negotiation of the plan of reorganization; (d) appearing before this Court and other courts and protecting the Equity Holders' Committee's interests; and (e) performing all other necessary valuation services in this case. [Docket No. 304, ¶ 11.]  The engagement letter for Tudor Pickering is attached to the Application to Employ Tudor Pickering. [Docket No. 304-3.]

On July 14, 2009, the Unsecured Noteholders' Committee filed the Houlihan Lokey Application. [Docket No. 309.]  The fee terms proposed in the Houlihan Lokey Application are as follows: (a) a nonrefundable initial fee of $500,000.00;  (b) a nonrefundable additional fee of $100,000.00 for August 1, 2009 through August 15, 2009; (c) a nonrefundable additional fee of $100,000.00 for August 16, 2009 through August 31, 2009; and (d) any out-of-pocket business expenses.  [Docket No. 309, ¶ 16.] According to the Houlihan Lokey Application and that firm's engagement letter, the services Houlihan Lokey Howard & Zukin Capital, Inc. (Houlihan Lokey) will render to the Unsecured Noteholders' Committee include, but are not limited to, the following: (a) evaluating the Debtor's debt capacity and enterprise valuation; (b) analyzing the Debtor's business plans and forecasts; (c) evaluating the Debtor's assets and liabilities; (d) analyzing and reviewing the Debtor's financial and operating statements; (e) assessing the financial issues and options concerning the Debtor's Chapter 11 plan of reorganization or liquidation; (f) providing financial analyses; (g) negotiating with the Debtor and third parties; and (h) providing testimony in court and in depositions.  [Docket No. 309, ¶ 15.]  The engagement letter between Houlihan Lokey and the

Unsecured Noteholders' Committee is attached to the Houlihan Lokey Application as "Exhibit B." [Docket No. 309, pp. 30-37.]

On July 14, 2009, Bank of America, N.A., as agent for itself and on behalf of the Prepetition Secured Lenders, (the Agent) filed its objections to the Applications. [Docket Nos. 310 & 311.] The Agent's objections are four-fold: (1) the proposed fees are too high; (2) the proposed fees are nonrefundable; (3) the proposed fees are to be paid from the Debtor's cash collateral on which the Agent has a lien; and (4) the amount of cash collateral that would have to be used to pay the fees would violate the limitations set forth in the Budget for paying consultants.

On July 15, 2009, the Official Committee of Unsecured Creditors (the Unsecured Creditors' Committee)[8] also filed objections to the Applications. [Docket Nos. 315 & 316.] The Unsecured Creditors' Committee essentially objects that the proposed fees are too high and nonrefundable.

On July 15, 2009, this Court held a hearing on, among other things, the Applications. In support of the Houlihan Lokey Application, the Court heard testimony from Adam Lee Dunayer (Dunayer), a manager at Houlihan Lokey. In support of the Tudor Pickering Application, the Court heard testimony from two witnesses: (1) Donald Randolph Waesche (Waesche), a shareholder of the Debtor and chairman of the Equity Holders' Committee; and (2) Lance Gilliland (Gilliland), an investment banker and partner at Tudor Pickering.

Tom A. Howley (Howley), counsel for the Unsecured Noteholders' Committee, proffered the testimony of Dunayer in support of the Houlihan Lokey Application. Dunayer gave no testimony regarding Houlihan Lokey's hourly rates and made no comparison of fees Houlihan Lokey charges

---

[8] The Unsecured Creditors' Committee consists of the following members: Production Services Networks U.S. Inc.; Superior Energy Services; Knight Oil Tools; Elevating Boats, LLC; and Blanchard Contractors, Inc.

for similar projects within similar time frames. Dunayer merely listed other matters where Houlihan Lokey has been retained. [Tape recording of July 15, 2009 hearing at 11:11 a.m.]  The proffered testimony indicated that the engagement letter "was the culmination of robust negotiations between the Unsecured Noteholders' Committee and Houlihan Lokey" and that the proposed fees were "vigorously negotiated." [Tape recording of July 15, 2009 hearing at 11:12 a.m.]  Additionally, the testimony indicated that section "328(a) is a prerequisite for Houlihan to swoop in here and provide this service." [Tape recording of July 15, 2009 hearing at 11:13 a.m.]

Howley represented to this Court that in March 2009, the Unsecured Noteholders' Committee considered hiring an investment banking firm but at that time decided not to do so.  However, Howley stated that in the wake of the Equity Holders' Committee seeking to engage an investment banker, the Unsecured Noteholders' Committee concluded that it had no choice but to engage its own investment banker in order to be ready to rebut any appraisal testimony that the Equity Holders' Committee might adduce from its own investment banker.

Additionally, Howley stated that the Unsecured Noteholders' Committee has already decided to vote for the Second Amended Plan but disagrees with the existing competing valuations and strongly disputes that there is equity in the Debtor.  Specifically, Howley represented to the Court the following:

> The [Unsecured] Noteholders' Committee has really been conscious of costs since the beginning of its formation . . . given the amount at stake here. The Noteholders collectively are owed $450,000,000.00 and could have easily justified the retention of a financial advisor dating back to March of this year, but the [Unsecured] Noteholders' Committee, conscious of cost, declined at that point to hire a financial advisor. The primary driver of this application is the recent formation of the Equity Committee and their announced intention to hire a valuation consultant and, at a minimum, engage in discussions about valuation and the potential for litigation over valuation. . . . We need approval today, your Honor, to hire a financial advisor.

Everyday between now and confirmation hearing is critical to get prepared to engage in negotiations or potential litigation if we have to over the plan confirmation. And we need that financial advisor hired pursuant to 328(a). I think it's critical in this type of project for this financial advisory firm to swoop in here and get ready. . . . They're going to have to take people off existing projects and devote themselves full-time to this project. In order to do that, Judge, they need the assurance that they are going to get paid at the end of the day and that's where 328(a) comes in and that's where it is regularly used to provide that assurance.

[Tape recording of July 15, 2009 hearing at 12:07 p.m.]

Howley further represented that:

The lack of objection from the [Unsecured] Noteholders' [Committee] should not be construed as any, any message that there is equity value here. We strongly dispute that. There has also been some references here today that the noteholders, you know, are simply on board with Parkman Whaling's valuation. That's not correct either, your Honor. What we're on board with is the plan and the treatment afforded the noteholders. That's separate and apart from the valuation that Parkman has put out there. We are not on board with Parkman Whaling's valuation at this point. That's why we're hiring our own expert to independently conduct a valuation. But just in summary, your Honor, we are not objecting to Tudor Pickering, but that should not be misconstrued that we in any way recognize that there is equity value here.

[Tape recording of July 15, 2009 hearing at 12:11 p.m.]

With respect to the Tudor Pickering Application, Waesche testified that the Equity Holders' Committee had investigated "a dozen" investment banking firms and negotiated seriously with three to four firms. The fees at the other firms which the Equity Holders' Committee investigated ranged from hourly rates to a $1.0 million flat fee. The Equity Holders' Committee chose Tudor Pickering because of that firm's "attractive fee level" and its "concentration in oil and gas." [Tape recording of July 15, 2009 hearing at 11:52 a.m.] When the Debtor's counsel asked Waesche why the Equity Holders' Committee is not satisfied to use the higher valuation from Birch Run in the plan confirmation process, Waesche testified that Birch Run was not an oil and gas "expert" or "in the

business of valuation." [Tape recording of July 15, 2009 hearing at 11:56 a.m.] Waesche testified

that the Equity Holders' Committee wants a "reputable valuation" of the Debtor.

Gilliland testified that Tudor Pickering has been in existence for approximately six years and

has operated as an investment banking firm with a focus on the energy industry for approximately

two and a half years.   [Tape recording of July 15, 2009 hearing at 12:03 p.m.]   He stated

unequivocally that the terms in the engagement letter are typical in the industry and the proposed fees

are even lower than some of the other fee arrangements that Tudor Pickering has negotiated in

similar situations.

At the close of the hearing on July 15, 2009, the Court took the matter under advisement.

On July 16, 2009, the Court held a hearing and announced its ruling denying the Tudor

Pickering Application and the Houlihan Lokey Application.   This Memorandum Opinion

memorializes that oral ruling.

### III. CREDIBILITY OF WITNESSES

At the hearing held on July 15, 2009, the Court heard testimony from three witnesses: (1)

Dunayer; (2) Waesche; and (3) Gilliland.  The Court finds most of their testimony to be conclusory,

scant, and self-serving on certain key points.

### IV. CONCLUSIONS OF LAW

**A.      Jurisdiction and Venue**

The Court has jurisdiction over these contested matters pursuant to 28 U.S.C. §§ 1334(b),

157(a), and 157(b)(1).   These contested matters are core proceedings pursuant to 28 U.S.C. §§

157(b)(2)(A), (M), and (O).   Additionally, these matters are core proceedings under the general

"catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th

Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to 28 U.S.C. § 1408(1).

**B.    Brief Summary of the Dispute at Bar**

Two valuation reports concerning the Debtor already exist: (1) the Parkman Whaling report; and (2) the Birch Run report.[9] It is not uncommon to have competing valuations of the Debtor in Chapter 11 cases. Birch Run disagrees with Parkman Whaling's valuation of the Debtor's assets. Birch Run argues that the Parkman Whaling valuation, which was prepared on March 31, 2009, is out-dated and too low given that the spot price of oil has increased and the forward price curves for both oil and natural gas have increased significantly. Birch Run's report indicates that the Debtor's equity value is approximately $212 million whereas Parkman Whaling's report values the equity at zero. The Debtor strongly disagrees with the Birch Run valuation and, as of July 15, 2009, believes that there is no equity value. The Birch Run report, if accurate, would allow the Class 9 - EPL Other Equity Interests to be paid rather than be "cancelled" and "not receive or retain any property or interest in property on account of their EPL Other Equity Interests." [Docket No. 223, p. 23.]

The Equity Holders' Committee, believing that there is equity in the Debtor but dissatisfied with the credentials of those who prepared the Birch Run valuation, filed the Tudor Pickering Application requesting permission to employ Tudor Pickering to conduct an independent valuation.

---

[9] Birch Run's alternative valuation analysis is included in the Second Amended Disclosure Statement.

Meanwhile, counsel for the Unsecured Noteholders' Committee, Howley, represented to this Court that the Unsecured Noteholders' Committee, which believes there is no equity, is convinced it must retain Houlihan Lokey in order to obtain an appraisal that will rebut the anticipated valuation that Tudor Pickering will produce. Thus, just as the Equity Holders' Committee mistrusts the Birch Run report even though that report espouses a position (i.e. the Debtor has equity) that supports this particular committee's goals, the Unsecured Noteholders' Committee is dissatisfied with the Parkman Whaling report even though that report espouses a position (i.e. there is no equity) that supports that committee's objective.

The Agent and the Unsecured Creditors' Committee have lodged objections to the Applications. If the Court approves the Applications, then Tudor Pickering and Houlihan Lokey will, among other things, generate two more valuation reports. These two investment banking firms have made it clear that they will only agree to be employed in this case for huge, guaranteed fees under § 328(a) even though, at the time the Applications were filed, the Procedure for Professionals Order and the Cash Collateral Order, which contains the Budget, were already in place governing the retention, compensation levels, and actual payment of compensation of professionals in this case.[10]

## C.   Whether Houlihan Lokey and Tudor Pickering Should be Employed Pursuant to 11 U.S.C. § 328

Section 328 was added to the Bankruptcy Code in 1978. Prior to 1978, some professionals refused to work for bankruptcy estates because their compensation could potentially be changed by

---

[10] It is true that there is a separate Order Approving the Debtor's Retention of Parkman Whaling, [Docket No. 176], but the Budget in the Cash Collateral Order governs the maximum amount of cash collateral that the Debtor may use each month to pay Parkman Whaling.

a bankruptcy judge after the professionals had completed the work.[11] *Nat'l Gypsum Co.*, 123 F.3d

861, 862 (5th Cir. 1997). Now, however, § 328 protects professionals from such uncertainties by

allowing them to obtain prior approval of their compensation plan from the bankruptcy court. *Id.*

at 863. Once a bankruptcy court approves a professional's compensation under § 328, only

extremely limited circumstances warrant altering that compensation. Specifically, § 328(a) states:

> [t]he trustee, or a committee appointed under section 1102 of this title, with the
> court's approval, may employ or authorize the employment of a professional person
> under section 327 or 1103 of this title, as the case may be, on any reasonable terms
> and conditions of employment, including on a retainer, on an hourly basis, on a fixed
> or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and
> conditions, the court may allow compensation different from the compensation
> provided under such terms and conditions after the conclusion of such employment,
> if such terms and conditions prove to have been improvident in light of developments
> *not capable of being anticipated at the time of the fixing of such terms and
> conditions.*

11 U.S.C. § 328(a) (emphasis added). Section "328(a) is the provision which iterates terms under

which a trustee, debtor in possession or committee can employ a professional. It is not itself a

separate source of employment approval. If such terms and conditions are not reasonable, the

bankruptcy judge may exercise his discretion, and deny the employment under 11 U.S.C. § 1103(a)."

*Unsecured Creditors' Comm., Houlihan, Lokey, Howard & Zukin Fin. Advisors, Inc. v. Joel*

*Pelofsky, United States Trustee (In re Thermadyne Holdings Corp., et al.)*, 283 B.R. 749, 755 n.9

(8th Cir. B.A.P. 2002).

Section 1103(a) states:

> (a) At a scheduled meeting of a committee appointed under section 1102 of this title,
> at which a majority of the members of such committee are present, and with the
> court's approval, such committee may select and authorize the employment by such

---

[11] *See In re Benassi*, 72 B.R. 44, 47 (Bankr. D. Minn. 1987) (citing H.R. Rep. No. 95-595, at 330 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6286; *In re Confections by Sandra*, 83 B.R. 729, 732 (9th Cir. B.A.P. 1987)).

> committee of one or more attorneys, accountants, or *other agents*, to represent or
> perform services for such committee.

11 U.S.C. § 1103(a) (emphasis added).  The Court concludes that the term "other agents" includes

professionals such as investment banking firms.  *See In re Farmland Indus., Inc.*, 286 B.R. 895, 897

n.3 (Bankr. W.D. Mo. 2002), *aff'd*, 296 B.R. 188 (8th Cir. B.A.P. 2003), *aff'd*, 397 F.3d 647 (8th

Cir. 2005) ("There is no debate that employment of a financial advisor is authorized under § 1103,

or that Houlihan Lokey was not properly employed pursuant to that section."); *see In re Thermadyne*

*Holdings Corp.*, 283 B.R. at 755 (discussing how the bankruptcy court exercised its discretion under

§ 1103(a) in denying the employment arrangement of Houlihan Lokey).  Thus, here, the Unsecured

Noteholders' Committee and the Equity Holders' Committee may certainly seek to obtain this

Court's approval of Houlihan Lokey and Tudor Pickering, respectively, to provide services and

counsel to them in this case.

    The parties who file the applications to employ—here, the Unsecured Noteholders'

Committee and the Equity Holders' Committee—have the burden to prove that the investment

bankers should be retained.  *See In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 318 (10th Cir. 1994)

("An applicant under § 327(a) has the burden of establishing by application and accompanying

affidavit that its chosen professional is qualified."); *see also In re Metricom, Inc.*, 275 B.R. 364, 371

(Bankr. N.D. Cal. 2002) (holding that the proponent of the application has the burden to prove that

the indemnity terms of employment are reasonable as required by § 328(a)).  Thus, these two

committees had the burden at the July 15, 2009 hearing to prove by a preponderance of evidence that

Houlihan Lokey and Tudor Pickering should be employed under § 328(a).

This Court does not take § 328(a) applications lightly because "[o]nce the bankruptcy court has approved a rate or means of payment, such as a contingent fee, the court cannot on the submission of the final fee application instead approve a 'reasonable' fee under § 330(a), unless the bankruptcy court finds that the original arrangement was improvident due to unanticipated circumstances as required by § 328(a)." *In re Tex. Sec., Inc.*, 218 F.3d 443, 445-46 (5th Cir. 2000) (citing *In re Nat'l Gypsum Co.*, 123 F.3d at 862-63); *XO Commc'ns, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005) ("Under section 328(a), a [bankruptcy] court may not revisit its prior determination as to the reasonableness of an agreement previously approved unless it determines that the terms and conditions proved to be improvident at the time approved in light of then-unforeseen circumstances."); *In re High Voltage Eng'g Corp.*, 311 B.R. 320, 332 (Bankr. D. Mass. 2004) ("Once a fee arrangement is approved under § 328, the ability of the bankruptcy court, as well as creditors and parties in interest, to review the amount of compensation payable to the professional is circumscribed."). Section 328(a) requires that subsequent developments rendering the fee arrangement improvident must be unforeseeable, not merely unanticipated, and therefore granting any requested modification to the fee agreement is very unlikely. *See Daniels v. Barron, et al. (In re Barron)*, 325 F.3d 690, 693-94 (5th Cir. 2003); *XO Commc'ns, Inc.*, 323 B.R. at 339 ("A finding of improvidence pursuant to section 328 is a difficult determination to make and therefore, courts rarely disturb the original terms and conditions of a professional's employment."); *In re Amberjack Interests*, 326 B.R. 379, 387 (Bankr. S.D. Tex. 2005) (noting the Fifth Circuit's stringent interpretation of § 328).

Indeed, the Fifth Circuit has interpreted § 328 as follows:

17

We have interpreted § 328 to limit the power of the bankruptcy court to alter the compensation of professionals: "[t]he court must therefore set the compensation award either according to § 328 or § 330. *If prior approval is given to a certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved.*"

*In re Tex. Sec., Inc.*, 218 F.3d 443, 445 (5th Cir. 2000) (quoting *In the Matter of Nat'l Gypsum Co.*, 123 F.3d 861, 862-63 (5th Cir. 1997)) (emphasis added).

Therefore, this Court, in its duties as a gatekeeper,[12] must have a sufficiently strong record when deciding whether to approve a professional under § 328(a). *See In re High Voltage Eng'g Corp.*, 311 B.R. at 333 (holding that a committee seeking to retain the professional must present evidence not conclusory statements). Unfortunately for the two investment banking firms now seeking employment in this case, the Court has a woefully insufficient record.

---

[12] In *Foreclosure Cases*, the plaintiff financial institutions were required by the court to produce documents proving that they were the assignees of the notes and mortgages at issue. 2007 WL 3232430, at *1 (N.D. Ohio Oct. 31, 2007). Initially, when these institutions filed suit, they failed to attach to the complaints as exhibits the assignments of the loan instruments evidencing their present ownership of the debts being sued upon. The District Court became concerned that the plaintiffs might not be the owners and holders of the debts being sued upon and thus might lack standing to prosecute the suit. The court therefore requested that the loan documents be produced. In making this request, the court stated "the federal courts must act as gatekeepers, assuring that only those who meet [certain] requirements are allowed to pass through." *Id.* at *3 n.3. The plaintiffs' counsel, in responding to the court's request that the plaintiffs prove they are the owners and holders of the notes, had the audacity to tell the court that "Judge, you just don't understand how things work." *Id.* The court, disagreeing with plaintiffs' counsel, responded, "Despite Plaintiffs' counsel's belief that 'there appears to be some level of disagreement and/or misunderstanding amongst professionals, borrowers, attorneys and members of the judiciary,' the Court does not require instruction and is not operating under any misapprehension. . . . The institutions seem to adopt the attitude that since they have been doing this for so long, unchallenged, this practice equates with legal compliance. Finally put to the test, their weak legal arguments compel the Court to stop them at the gate." *Id.* at *3.

This Court is also not acting under any misapprehension in denying the two Applications despite the testimony that the proposed compensation is standard in the industry and lower than other engagements. Here, the investment bankers have displayed the same sort of arrogance as the lenders in *Foreclosure Cases*. They expect to immediately receive a nondisgorgable, astronomical sum for future services to be paid not only out of the Debtor's bankruptcy estate, but out of its cash collateral. While these two firms may well command excessive rates for their services in other instances, in the case at bar, this Court must act as gatekeeper and ensure that the employment of these professionals is in the best interests of the Debtor's bankruptcy estate and consistent with preserving the integrity of the bankruptcy system.

1.    **Factors Governing Whether Professionals Should be Employed Pursuant to §
      328(a)**

In *High Voltage Engineering Corp.*, the Bankruptcy Court for the District of Massachusetts

drew two conclusions from the growing body of case law construing § 328(a).  First, "a bankruptcy

court has an obligation to determine the reasonableness of terms and conditions before authorizing

the employment of professionals under § 328(a) and may eliminate, modify, or impose additional

terms and conditions to satisfy the requirement of reasonableness."  *Id.* at 333.  Second, "once

approved, the terms and conditions cannot be modified without a finding they were improvident."

*Id.*  Therefore, "*the trustee or committee seeking the employment of professionals under § 328(a)*

*must establish that the terms and conditions of employment are reasonable, and evidence, not*

*conclusory statements, is required to satisfy that burden.*"  *Id.* (emphasis added).

In that same case, the court also set forth a non-exclusive list of factors, established by the

Bankruptcy Court for the District of Delaware in *Insilco Technologies, Inc.*, which should be

considered when determining whether to approve employment subject to § 328(a):

> (1) whether terms of an engagement agreement reflect normal business terms in the
> marketplace; (2) the relationship between the Debtor and the professionals, i.e.,
> whether the parties involved are sophisticated business entities with equal bargaining
> power who engaged in an arms-length negotiation; (3) whether the retention, as
> proposed, is in the best interests of the estate; (4) whether there is creditor opposition
> to the retention and retainer provisions; and (5) whether, given the size,
> circumstances and posture of the case, the amount of the retainer is itself reasonable,
> including whether the retainer provides the appropriate level of "risk minimization,"
> especially in light of the existence of any other "risk-minimizing" devices, such as
> an administrative order and/or a carve-out.

*In re High Voltage Eng'g Corp.*, 311 B.R. at 333 (quoting *In re Insilco Techs., Inc.*, 291 B.R. 628,

633 (Bankr. D. Del. 2003)).

The Court will apply the non-exclusive list of factors to determine whether to approve the Applications subject to § 328(a). *In re High Voltage Eng'g Corp.*, 311 B.R. at 333 (quoting *In re Insilco Techs., Inc.*, 291 B.R. 628, 633 (Bankr. D. Del. 2003)). "This list is not intended to be exhaustive, nor will every factor necessarily be of equal weight, depending upon the circumstances." *In re Insilco Techs., Inc.*, 291 B.R. at 634.

### a.  Whether the terms of an engagement agreement reflect normal business terms in the marketplace

First, Houlihan Lokey and Tudor Pickering contend that the terms of their respective engagement agreements are standard in the marketplace.

In *In re Metricom, Inc.*, the bankruptcy court rejected a § 328 application to employ Houlihan Lokey where the record was insufficient as to the amount of its fee and the terms under which it would be paid. 275 B.R. 364, 372 (Bankr. N.D. Cal. 2002). Specifically, the court stated that there was "no evidence that the Bondholders' Committee could not have obtained comparable services for the same price from another financial advisor without having to agree to the subject provisions" in the engagement letter. *Id*. The *Metricom* court also expressed concerns that Houlihan Lokey was demanding certain special terms of employment that had not been demanded by other professionals already employed to perform the same services in that case. The court determined that "no matter how 'standard' such protections may be for Houlihan, they are not the norm in this Chapter 11 case." *Id*.

This Court is faced with a substantially similar factual scenario to *Metricom*. First, this Court has virtually no evidence that the committees in the case at bar could not have obtained comparable services without paying the excessive fees demanded by Houlihan Lokey and Tudor Pickering.

20

Second, one other investment banking firm—i.e. Parkman Whaling—has already been retained to provide similar valuation services in the case at bar without demanding such a high premium; Parkman Whaling has received $75,000.00 per month, which is substantially lower than the fees demanded by Houlihan Lokey and Tudor Pickering.  It is entirely legitimate to ask why Houlihan Lokey and Tudor Pickering are unwilling to work under the same or similar terms as Parkman Whaling.  Neither Houlihan Lokey nor Tudor Pickering adduced sufficient testimony at the July 15, 2009 hearing to convince this Court that they should be treated so differently—indeed, so much more favorably—than Parkman Whaling.  Stated differently, Parkman Whaling is as capable and competent an organization as Houlihan Lokey and Tudor Pickering, and to approve the far more exorbitant terms demanded by Houlihan Lokey and Tudor Pickering would suggest that these two firms somehow provide services that are superior in quality than those provided by Parkman Whaling.  There is nothing in the record to suggest that this is true.

Moreover, Gilliland testified in conclusory fashion that the terms in Tudor Pickering's engagement letter are typical in the industry and lower than other engagements that Tudor Pickering has accepted in similar situations.  While this *may* be true, the Court has no specific testimony or evidence that this representation is in fact accurate.  And, indeed, Parkman Whaling has performed substantially similar services at a fraction of the rate demanded by Tudor Pickering.  In *United Artists Theatre Co., et al. v. Walton*, the Third Circuit stated that no matter how common in the market-place Houlihan Lokey's employment arrangements are, "[the Third Circuit's] approach is 'market driven,' not 'market-determined,' especially in the realm of bankruptcy where courts play a special supervisory role."  315 F.3d 217, 230 (3d Cir. 2003).  This Court also does not take a "market-determined" approach regarding the investment bankers' proposed compensation.  Stated

21

differently, the amount of compensation that Houlihan Lokey and Tudor Pickering believe to be standard in the industry does not, in and of itself, render the compensation reasonable under § 328. Rather, the Court needs specific evidence in the record to determine whether the proposed compensation is reasonable under § 328. For example, the committees' respective counsel needed to adduce testimony about the specific compensation earned by investment bankers other than Tudor Pickering in engagements similar in size and circumstance to the engagement proposed in this case. Yet, the Court heard no such testimony on this point. Indeed, the only information in the record on this point is that a competitor of Houlihan Lokey and Tudor Pickering—i.e. Parkman Whaling—has been willing to render services for $75,000.00 per month, which is a figure substantially lower than the six-figure fees requested by Houlihan Lokey and Tudor Pickering. Given the wholly insufficient record in this case on such points, the Court concludes that this factor weighs against approval of the Applications.

b.    **The relationship between the Debtor and the professionals, i.e., whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms-length negotiation**

Second, proof that arms-length negotiations took place between the committees and the investment bankers is another factor that should be considered when determining whether to approve the employment of a professional pursuant to § 328(a). *See, e.g.*, *In re United Artists Theatre Co.*, 315 F.3d at 238 (In reviewing factors as to what is "reasonableness" for approving fees under § 328, the court notes that "United Artists and Houlihan Lokey are sophisticated business entities with equal bargaining power who engaged in arms length negotiations.").

With respect to the negotiations between the Unsecured Noteholders' Committee and Houlihan Lokey, Dunayer's proffered testimony indicated that "robust negotiations" took place and

22

that the proposed fees were "vigorously negotiated." Such testimony is extremely generalized and too conclusory. The Court needed to hear more specific testimony. For example, who conducted the negotiations for the Committee? Who conducted the negotiations for Houlihan Lokey? Where did the negotiations take place? How long did the negotiations occur? Were proposals and counter-proposals made and, if so, were they reduced to writing?

With respect to the negotiations between the Equity Holders' Committee and Tudor Pickering, Waesche testified that the Equity Holders' Committee negotiated seriously with three to four investment banking firms. Yet, when the undersigned judge asked Waesche if any of the other investment banking firms whom the Equity Holders' Committee interviewed would accept the engagement under the terms required by the Procedure for Professionals Order instead of demanding immediate, substantial, and virtually nondisgorgable sums of money, Waesche could only respond by conceding that "Judge, I deferred those specifics to my attorney." [Tape recording of July 15, 2009 hearing at 12:01 p.m.] It is disconcerting that the chairman of the Equity Holders' Committee was not more knowledgeable about the substance of the negotiations. And, just as with Houlihan Lokey's witness (Dunayer), Waesche gave no testimony about the specific negotiations that took place with Tudor Pickering, when such negotiations occurred, and whether proposals and counter-proposals were made and, if so, whether these proposals were reduced to writing.

In sum, although the Court heard testimony from these witnesses, the substance of their testimony is insufficient to establish that arms-length negotiations took place between the investment banking firms and the committees. Thus, this factor, among others, weighs against approving the Applications.

c.      **Whether the retention, as proposed, is in the best interests of the estate**

Third, the proposed retention of Houlihan Lokey and Tudor Pickering is not in the best interest of the estate.  Under Fifth Circuit precedent, to receive compensation under § 330, professionals hired in a bankruptcy case must provide a tangible, identifiable, and material benefit to the estate.  *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998).  In *Pro-Snax*, the debtor's counsel argued that "a reasonableness test is appropriate—whether the services were objectively beneficial toward the completion of the case at the time they were performed."  *Id.* at 426.  However, the opposing creditors, "by contrast, advocate[d] a more stringent test—whether [debtor's counsel's] services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate."  *Id.*  The Fifth Circuit held that "the stricter test is the appropriate measure."  *Id.*  Therefore, with respect to fee applications filed under § 330, a bankruptcy court within the Fifth Circuit must review not only the reasonableness of the services rendered and value associated with those services at the time the services were rendered, but also consider whether, in hindsight, the professionals' services provided a tangible, identifiable, material benefit to the estate.  *Id.*

In *Kaye v. Hughes & Luce, LLP*, the Honorable Jane J. Boyle, United States District Judge for the Northern District of Texas, gave an extensive analysis of *Pro-Snax. Kaye v. Hughes & Luce, LLP*, No. 3:06-CV-01863-B, 2007 WL 2059724 (N.D. Tex. July 13, 2007).  Judge Boyle held that *Pro-Snax* was indeed binding on courts in the Fifth Circuit.  *Id.* at *7-9.  The bankruptcy court had held that the Fifth Circuit's discussion of the legal test in *Pro-Snax* was dictum and it applied only to debtor's counsel and not the official unsecured creditors' committee's counsel.  *Id.* at *10-11.  However, on appeal, the District Court held that the test announced in *Pro-Snax* is not dictum and

applies not only to debtor's counsel, but also to official committee's counsel. *Id.* at *12 ("Though the holding of *Pro-Snax* was specifically directed towards attorneys for the debtor, the Court perceives of no reason why the Fifth Circuit would apply a lesser standard to attorneys for an equity, or other official, committee."). This Court accepts Judge Boyle's holding that *Pro-Snax* is not dictum, but rather binding precedent on courts in the Fifth Circuit, and this Court further accepts Judge Boyle's holding that *Pro-Snax* applies to all professionals, not just debtors' counsel. Therefore, this Court concludes that *Pro-Snax* applies to investment bankers.[13] *See In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 24 (Bankr. S.D.N.Y. 1991) ("There is no doubt that investment bankers/advisors are subject to the professional retention requirements of § 327.").

If this Court must apply this hindsight test from *Pro-Snax* to professionals whose fee applications will be reviewed pursuant to § 330, then it necessarily follows that this Court should also apply the same test to those professionals seeking to be compensated under § 328; otherwise, every professional would always seek compensation pursuant to § 328 in order to escape *Pro-Snax*'s hindsight test. For this reason, § 328 applications require particularly close scrutiny at the outset because the money paid to these professionals will be even more difficult, if not virtually impossible, to disgorge once distributed. *See In re Barron*, 325 F.3d at 693-94; *XO Commc'ns, Inc.*, 323 B.R. at 339; *In re Gillett Holdings, Inc.*, 137 B.R. 452, 460 n.22 (Bankr. Colo. 1991). Therefore, although *Pro-Snax* is typically applied *after* the professionals' services have already been rendered, the Court should, under § 328, make a preemptive determination of the benefit that the professionals' services

---

[13] It is worth noting that in 2001, District Judge Boyle's colleague, the Honorable Joe Kendall, affirmed a bankruptcy court's ruling that *Pro-Snax* applied to the fee application of PricewaterhouseCoopers, an investment banking firm. *PricewaterhouseCoopers v. Litzler (In re Harbor Fin. Group, Inc.)*, Nos. 99-37255-SAF-7, Civ.A. 300CV1283X, 2001 WL 1041785, at *2-3 (N.D. Tex. Sept. 5, 2001). Judge Kendall did not expressly hold that *Pro-Snax* applies to investment bankers, but rather held that *Pro-Snax* applies to all "professional persons." *See id.*

25

will provide to the estate. This task is difficult because the *Pro-Snax* test is performed by the Court after a professional's services have already been rendered to determine if the professional has provided a tangible, identifiable, and material benefit to the estate; whereas, when determining whether to approve a professional who seeks to be paid pursuant to § 328, the Court must predict whether, and to what extent, a professional will be able to provide a tangible, identifiable, and material benefit to the estate. For the Court to make such an assessment, the parties must make a sufficient record as to what tangible, identifiable, and material benefits the services of the proposed professionals will provide to the estate. In the case at bar, the record is severely lacking as to whether the services of Houlihan Lokey and Tudor Pickering will provide a tangible, identifiable, and material benefit to the Debtor's estate.

Accordingly, *Pro-Snax* provides this Court with an additional reason why the Applications should be denied. The record is insufficient to establish how the services to be rendered by Houlihan Lokey and Tudor Pickering will provide a tangible, identifiable, and material benefit to the estate. These professionals may not just simply appear at the hearing, give conclusory testimony, and then expect to walk out of the courtroom with nonrefundable checks aggregating $1.0 million.

Additionally, because the funds that would be used to pay these two investment banking firms constitute the Debtor's cash collateral, the Court must focus on whether allowing such use of these funds is in the best interests of the Debtor's estate. Once again, the record is insufficient for this Court to grant the relief requested. None of the witnesses gave any testimony that demonstrated how the Debtor's estate would benefit from the immediate reduction of $1.0 million in cash collateral.

In sum, this factor militates against approving the Applications.

    **d.**      **Whether there is creditor opposition to the retention and retainer provisions**

Fourth, two interested parties—the Agent and the Unsecured Creditors' Committee—have filed their own respective objections to the Applications.[14]   The Agent's objections to the Applications are four-fold: (1) the proposed fees are too high; (2) the proposed fees are nonrefundable; (3) the proposed fees are to be paid from the Debtor's cash collateral on which the Agent has a lien and for which the applicants have failed to provide adequate protection; and (4) the amount of cash collateral that would have to be used to pay the fees would violate the limitations set forth in the Budget for paying consultants.  The Unsecured Creditors' Committee's objections to the Applications are primarily that the proposed fees are too high and nonrefundable.  Therefore, this fourth factor weighs against approving the Applications.

    **e.**      **Whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization," especially in light of the existence of any other "risk-minimizing" devices, such as an administrative order and/or a carve-out**

Fifth, aside from the unreasonableness of expecting to be paid an up-front, nonrefundable $500,000.00 fee, the Court is also extremely discouraged that Tudor Pickering has also requested a $25,000.00 per day witness fee.[15]   It is noteworthy that this fee is to be paid regardless of whether

---

[14] The Debtor never filed a written objection to the proposed employment of either Houlihan Lokey or Tudor Pickering.  Despite not having filed a written objection, at the July 15, 2009 hearing, the Debtor's counsel did orally announce the Debtor's objection regarding Tudor Pickering's $25,000.00 per day witness fee. [Tape recording of July 15, 2009 at 11:33 a.m.]

[15] Despite not having filed a written objection to Tudor Pickering's $25,000.00 per day witness fee, the Debtor's counsel did orally announce at the July 15, 2009 hearing the Debtor's objection about this particular aspect of the proposed fee for Tudor Pickering.  [Tape recording of July 15, 2009 at 11:33 a.m.] Counsel for the Equity Holders' Committee, apparently more worried about the Debtor objecting to this proposed per diem fee of $25,000.00 than the objections posed by the Agent and the Unsecured Creditors' Committee, requested a recess in order to discuss this discrete issue with counsel for the Debtor.  The Court granted the request.  Upon returning to the record, counsel for the Equity Holders' Committee asked Gilliland what his understanding was of the negotiations with Debtor's counsel over

the witness testifies for one hour or eight hours, or somewhere in between.  In these dire financial

times, a request to be paid a $25,000.00 per day witness fee out of the coffers of a publicly traded

company in bankruptcy is not only excessive, but unconscionable—particularly when the amount

of this *daily* fee is compared to the *annual* compensation earned by certain Americans who provide

arguably more essential services to society.[16]

   Assuming that the witness testifies for no more than eight hours per day—and this is

assuredly a safe assumption—the hourly fee would be $3,125.00 (i.e. $25,000.00 divided by eight

hours equals $3,125.00 per hour); and, assuming that the witness testifies for less than eight hours

per day, the hourly fee would increase concomitantly.  Given these figures, the Court concludes that

---

the $25,000.00 per day witness fee, and Gilliland testified as follows: "My understanding of the arrangement that has been reached is that the testifying fee will go away, but that we will, if work is continuing post-August 15, between August 15 and September 1st, we would get paid an additional $25,000.00 and then the rest of this letter [i.e. Tudor Pickering's engagement letter] would be in place." [Tape recording of July 15, 2009 hearing at 12:05 p.m.] Accordingly, the terms of Tudor Pickering's proposed retention changed in the wake of the negotiations conducted during the recess. Nevertheless, the Court feels compelled to discuss the initial provision in the proposed terms requiring a daily witness fee of $25,000.00 because the very fact that Tudor Pickering made such an audacious request underscores how oblivious the investment banking community—or, at least this one investment banking firm—is to the extremely hard economic times in which the country in general, and this Debtor in particular, find themselves.  This Court believes that a discussion of the $25,000.00 daily witness fee request is appropriate to telegraph to the business bankruptcy bar and the investment banking community how unseemly this request really is.

   [16] For example, the men and women of our nation's armed forces, who risk their lives to preserve and protect the abundant freedoms of this country, earn an annual salary that barely exceeds Tudor Pickering's proposed $25,000.00-per-day appearance fee.  *See* United States Army Public Website, Benefits - Total Compensation, http://www.goarmy.com/benefits/total_compensation.jsp (listing the average annual salary for a military police sergeant as $26,967.00). Moreover, there are numerous other occupations whose members are in daily physical danger and who provide absolutely necessary services for our society but yet are paid an annual salary approximating the requested daily fee of the Tudor Pickering witness.  For example, a nursing-aide at a public hospital, can expect to earn less *annually* than what Tudor Pickering is requesting for *each day* it appears for a hearing. *See* United States Department of Labor, Bureau of Labor Statistics Website, Occupational Employment and Wages, May 2008, Nursing Aides, Orderlies, and Attendants, http://www.bls.gov/oes/current/oes311012.htm (listing the average annual salary for a nursing-aid as $24,620.00). Finally, public school teachers who are educating future generations can expect to earn barely more in one year than Tudor Pickering seeks to be paid for each day that it appears for a hearing. *See* Tex. Educ. Code Ann. § 21.402(c) (listing the minimum annual salary of a public school teacher in Texas with two years of prior experience as $28,490.00 for the 2008-2009 school year).  The per annum salaries of the military personnel, nursing-aides, and public school teachers, compared with the requested daily fee of $25,000.00, speaks volumes about the level of hubris among some members of the investment banking community.

28

the $25,000.00 per day witness fee that Tudor Pickering has requested is *per se* unreasonable.  No witness is worth such an absurd amount regardless of the dollars at stake in the case.

It is particularly galling that Tudor Pickering seeks approval of a nonrefundable witness fee of $25,000.00 per day when the Cash Collateral Order and Budget have been in effect for several weeks.  The Cash Collateral Order expressly states that the Budget must be strictly complied with; and there is no room in the Budget for daily witness fees of $25,000.00, nor, for that matter, the $500,000.00 nonrefundable fee that Tudor Pickering wants in addition to the daily witness fee.  The Cash Collateral Order and Budget are normal orders that have been put in place to ensure a proper and fair administration of the Debtor's estate.  The exorbitant fees demanded by Tudor Pickering and Houlihan Lokey, if approved by this Court, would disrupt, if not destroy, the key terms of the Cash Collateral Order and Budget.  Accordingly, even given the size, circumstances, and posture of the case, because the amount of the proposed compensation is itself unreasonable, this fifth factor weighs against approving the Applications.

In sum, all five factors weigh against granting the Applications.

The Court notes that it has discretion to alter the compensation proposed in the Applications. The Third Circuit has held that section 328(a) authorizes bankruptcy courts to devise and impose "caps on the fees that a professional may charge, even if the committee that submitted the application at issue did not propose that limitation."  *In re Fed. Mogul-Global Inc.*, 348 F.3d 390, 403 (3d Cir. 2003).  Stated differently, under § 328(a), bankruptcy courts have the discretion to tailor the fees in the applications if the court is dissatisfied with the terms proposed in the applications.  The language of § 328 "may easily be interpreted to mean that the Court may approve the employment of a professional on any terms and conditions that the Court finds necessary to satisfy the requirement

29

of reasonableness." *Id*. at 397. Based upon the plain language of § 328(a), there is no question that this Court has discretion to approve something less than what Houlihan Lokey and Tudor Pickering have demanded. *See* 11 U.S.C. § 328(a).

At the July 15, 2009 hearing, counsel for the Unsecured Creditors' Committee argued, in the first instance, that the Court should simply not approve the Applications to employ these investment bankers. In the alternative, counsel for the Unsecured Creditors' Committee argued that if this Court approves the employment of these investment bankers, then it should only approve the applications with a lesser amount of guaranteed, nondisgorgable fees. This Court concludes it should not approve the Applications, even on a modified basis with lower, up-front fees, due to the absence of a sufficient record and the existence of two thorough valuation reports.

2.      **Special Criteria for Whether to Employ an Investment Banking Firm Pursuant to § 328(a)**

In addition to the general factors for reviewing employment applications under § 328, the Bankruptcy Courts for the Southern District of New York and the District of Massachusetts have adopted criteria that specifically relate to an investment banker's employment application under § 328(a):

> Any investment banker/advisor retention application submitted to this court must present the scope and complexity of the assignment, its anticipated duration, expected results, required resources, the extent to which highly specialized skills may be needed and the extent to which they have them or may have to obtain them, projected salaries of participating professionals, billing rates and prevailing fees for comparable engagements, current retentions in bankruptcy by the retained firm, and any estimated lost opportunity costs due to time exigencies of the job. In addition, the actual retention agreement between the investment banker/advisor and the client must be attached to the retention application and, the party retaining the professional must describe the process by which the financial banker/advisor has been selected. This latter requirement is aimed specifically at offsetting what we perceive as a lack of competitiveness in the selection process. Finally, the application must explain how

the investment banker/advisor will eliminate, or at least reduce, the duplication of effort[s]. . . . We liken our requirements to a financial impact statement on the estate. Only with an advance picture of the job to be accomplished will we be able to measure the results (or lack thereof) achieved.

*In re High Voltage Eng'g Corp.*, 311 B.R. at 333-34 (quoting *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 27 (Bankr. S.D.N.Y. 1991)). In *High Voltage Engineering Corp.*, there was an insufficient record to approve the proposed compensation because the court was given no information about the scope and complexity of the assignment or the skills needed for it. *Id*. at 335. This Court has a similar problem here because no testimony was adduced regarding the "expected results, required resources, . . . billing rates and prevailing fees for comparable engagements, current retentions in bankruptcy by the retained firm, and any estimated lost opportunity costs due to time exigencies of the job." *Id*. at 333.

Given the insufficient record in the case at bar, this Court has very little evidence relating to certain of the factors set forth above. Specifically, based on the testimony adduced at the July 15, 2009 hearing, this Court cannot determine: (a) the results that these firms expect to produce; (b) the resources these firms will require to perform their services; or (c) the projected salaries of the specific individuals that will be employed by these firms to perform the requested services. All this Court has in the record is, at best, minimal testimony from Dunayer, Waesche, and Gilliland, without any specific evidence to establish the reasonableness of the substantial sums of money proposed to be paid to these investment banking firms.

With respect to the remaining factors, no evidence was introduced suggesting that Parkman Whaling was not well-qualified to generate the enterprise valuation that it has produced for the estate. There was some testimony—from Waesche—suggesting that the Birch Run valuation report

31

was done by an organization without expertise in the oil and gas field, but this testimony was very brief and conclusory. A review of the Birch Run valuation report—which is discussed in detail in the Second Amended Disclosure Statement and is on the docket as an exhibit to Birch Run's Objection to the Debtor's Proposed Disclosure Statement filed on June 8, 2009, [Docket No. 209-3]—suggests that, contrary to Waesche's very brief testimony, the Birch Run valuation report was compiled by sophisticated individuals with expertise in corporate finance and the oil and gas industry, in general, and offshore producers in the Gulf of Mexico, in particular. Thus, the record reflects that two legitimate valuation reports have been produced in this case: one contending that the enterprise value is zero and the other contending that there is substantial value. Under these circumstances, even if Houlihan Lokey and Tudor Pickering have substantial expertise in the oil and gas field such that they have the capability of generating two more valuations, there is little justification for so doing given the exorbitant fees being requested.

Additionally, there is very little testimony regarding the prevailing rate for the services for which Tudor Pickering and Houlihan Lokey are seeking to provide. Not only is the record silent as to the going rate for comparable valuation services, there is minimal testimony regarding what these two investment banking firms normally charge. Dunayer gave no testimony regarding Houlihan Lokey's hourly rates and made no comparison of the fees Houlihan Lokey charges for similar projects within similar time frames. Gilliland merely testified that the proposed terms of Tudor Pickering's employment in the case at bar are lower than Tudor Pickering normally charges for such services, which does not address the issue of whether the compensation that it seeks here is comparable to that charged by other firms for similar services. Waesche testified that the Equity Holders' Committee investigated "a dozen" other investment banking firms and that the committee

32

conducted "serious" negotiations with three to four of these firms—whose fees ranged from various hourly rates up to a flat fee for $1.0 million—but ultimately chose Tudor Pickering because of its "attractive fee level." This non-specific and self-serving testimony fails to establish that Tudor Pickering's rate is reasonable by industry standards.

Even though the criteria described above requires an applicant seeking to employ an investment banking firm to provide evidence on the firm's retention terms in other bankruptcy cases, Dunayer merely listed other matters where Houlihan Lokey had been retained without providing any details of the services his firm performed, the purpose for which the firm was retained, or the fees associated with the engagement. Neither Waesche nor Gilliland gave any testimony on these points in support of the Tudor Pickering Application.

With respect to these firms' lost opportunity costs and the exigencies of its proposed employment, Howley merely represented that Houlihan Lokey is "going to have to take people off existing projects and devote themselves full-time to this project." Even if the representations of the Unsecured Noteholders' Committee's counsel constituted evidence—which they do not—there is no estimate of the amount of such loss that Houlihan Lokey would incur by taking on the engagement for the Unsecured Noteholders' Committee. Nor was there any testimony adduced with respect to any lost opportunity costs that Tudor Pickering would incur by taking on the engagement for the Equity Holders' Committee.

Although Houlihan Lokey's and Tudor Pickering's engagement letters were attached to the Applications, these two engagement letters do not "describe the process by which the financial banker/advisor has been selected." Moreover, both of the letters are fairly generic in nature. Indeed, the Tudor Pickering engagement letter is so generic that it does not even describe the services that

33

Tudor Pickering will provide to the Equity Holders' Committee; it simply contains several sections with such boilerplate titles as "Indemnity" and "Information." Even worse, apparently Tudor Pickering, in its rush to sign up the Committee, failed to proofread its letter because it contains Sections 1 through 9 and 11—but no Section 10.[17] Perhaps Section 10 described the specific services to be rendered to the Equity Holders' Committee, but, of course, the absence of this section makes this statement sheer speculation.

Finally, as the Bankruptcy Courts for the District of Massachusetts and the Southern District of New York have aptly explained:

> the application must explain how the investment banker/advisor will eliminate, or at least reduce, the duplication of effort Judge Paskey alluded to in *[In re] Hillsborough [Holdings Corp.]*, 125 B.R. [837] at 838-39 [(Bankr. M.D. Fla.1991)], where there are armies of professionals apparently doing the same thing as the investment banker/advisor. Specifically, the intention is to avoid accountants and investment bankers/advisors massaging the same numbers twice when one trip to the masseuse would generally suffice.

*In re High Voltage Eng'g Corp.*, 311 B.R. at 334 (quoting *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. at 27). Here, although the Equity Holders' Committee believes Tudor Pickering's services are necessary because that firm specializes in valuations in the oil and gas industry, this reason alone is insufficient to satisfy the committee's burden of proving that Tudor Pickering's valuation will somehow be different or more comprehensive than the reports provided by Parkman Whaling and Birch Run. Additionally, the Unsecured Noteholders' Committee seeks to employ Houlihan Lokey simply because the Equity Holders' Committee is also seeking to engage an independent valuation expert which might produce a report with which the Unsecured Noteholders'

---

[17] Apparently, the Equity Holders' Committee, in its haste to ink up Tudor Pickering on the proposed engagement, also overlooked the absence of Section 10.

34

Committee disagrees. This argument boils down to a sophomoric request that if the Equity Holders' Committee gets something, the Unsecured Noteholders' Committee wants one, too. This reasoning fails to explain why employing a third and fourth valuation consultant would not simply duplicate the others' efforts. Additionally, these committees' overgeneralized assertions that they "disagree" with the two existing valuation reports is insufficient to meet the burden required for retention under § 328(a).

There is yet another aspect about the Applications that this Court finds troublesome. Howley unequivocally stated that the Unsecured Noteholders' Committee strongly disputes the conclusion of the Birch Run report that "there is equity value here [i.e. in the Debtor]." He also stated his client has already decided to vote for the Second Amended Plan—in his words: "What we're on board with is the plan and the treatment afforded the Noteholders." Given these positions, and given that the Debtor has already obtained the Parkman Whaling report that the enterprise value is zero—a report, the Court notes, which the Committee has never disputed and was compiled by a well-qualified investment banking firm—it is extravagant for the Committee to request an unconditional transfer to Houlihan Lokey of at least $500,000.00 of estate funds so that yet another valuation report can be generated showing no equity value.

**D.      Adequate Protection Under 11 U.S.C. §§ 361 and 363**

As if these investment banking firms' outlandish request for nondisgorgable fees was not enough, the Applications also request that the fees be paid out of the Debtor's cash collateral. The parties requesting court approval to use cash collateral have the burden to prove there is adequate protection for the entities that have an interest in the cash collateral. 11 U.S.C. § 363(p)(1); *In re Carbone Cos., Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008).

35

Here, there is no dispute among the parties that any cash transfers to Houlihan Lokey and Tudor Pickering would be transfers of cash collateral on which the Agent has a lien. Moreover, there can be no dispute that use of cash collateral requires providing adequate protection to the lienholder. *See* 11 U.S.C. §§ 361, 363(c)(2)(B) & (e).

Exactly what constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) (citing *In re Martin*, 761 F.2d 472 (8th Cir. 1985)). The focus of the requirement is to protect a secured creditor—in this case, the Agent—from diminution in the value of its interest in collateral during the reorganization process. *See In re Kain,* 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *Delbridge v. Prod. Credit Assoc. & Fed. Land Bank*, 104 B.R. 824 (E.D. Mich. 1989); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (finding that a question of adequate protection should focus on secured lender's entire property interests, not just its interest in cash sought to be used). "Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact." *In re O'Connor*, 808 F.2d at 1397; *Aurelius Capital Master, Ltd. v. Tousa, Inc.*, No. 08-61317, 2009 U.S. Dist. LEXIS 12735, at *69 (S.D. Fla. Feb. 5, 2009) ("[W]hether a secured creditor is adequately protected is a question of fact.").

The Agent has objected to the use of cash collateral because (1) it is not adequately protected; and (2) the proposed use of the estate funds to pay these investment banking firms violates the Cash Collateral Order insofar as the Budget does not provide for the payment of these firms. Typically, the debtor has the burden to prove adequate protection, but any entity seeking to use the Debtor's cash collateral must demonstrate some degree of adequate protection to the objecting lender whose

lien attached to the cash collateral. *See In re Carbone Cos., Inc.*, 395 B.R. at 635. Therefore, because the Unsecured Noteholders' Committee and the Equity Holders' Committee have filed the Applications, these two committees must demonstrate that the Agent is adequately protected.

This Court has virtually nothing in the record to make a factual finding that the Agent is adequately protected if this Court approves the Applications and allows the fees to be paid out of the Debtor's cash collateral. Indeed—as with this Court's inquiry under § 328—the Applications, the respective engagement letters, and the testimony from Dunayer, Waesche, and Gilliland leave this Court with a woefully insufficient record. Moreover, there was no testimony justifying why the Budget should be changed to allow for the use of cash collateral to pay Houlihan Lokey and Tudor Pickering. Therefore, because the applicants have failed to demonstrate that the Agent is adequately protected as required by the Bankruptcy Code and, further, because use of the funds would violate the Cash Collateral Order, this Court will not allow the requested fees to be paid out of the Debtor's cash collateral. Accordingly, the lack of adequate protection provides this Court with an additional, and independent, reason for denying the Applications.

## V. CONCLUSION

At some point, this Court must draw the line between what is reasonable and what is not. To quote the Fifth Circuit: "'[W]hen a pig becomes a hog it is slaughtered.'" *In re Swift*, 3 F.3d 929, 930 (5th Cir. 1993) (quoting *In re Zouhar*, 10 B.R. 154, 157 (Bankr. D.N.M. 1981)). "As the finder of fact, the bankruptcy court has the primary duty to distinguish hogs from pigs." *Id*. Although the Fifth Circuit expressed this sentiment under a different set of facts than those in the case at bar,[18] this

---

[18] In *Swift*, the Fifth Circuit was referring to the debtor's pre-bankruptcy actions evidencing an intent to hinder, defraud, delay, or conceal assets of his estate from his creditors. *See Swift*, 3 F.3d at 930.

Court sees good reason why this maxim applies here with equal force. These two investment banking firms have become hogs. Indeed, the investment bankers in the case at bar appear to have embraced the outlook expressed by Michael Douglas's character, Gordon Gekko, in the film *Wall Street* that "Greed—for lack of a better word—is good. Greed is right. Greed works."[19] That may be how Wall Street views the world, but it is not how this Court sees things. In this Court, Greed is not good; Greed is wrong; and Greed does not work. Rather, the Court refers the parties to the words of Frederick Douglass, a prominent and compelling figure in American history who knew something about hard work: "People might not get all they work for in this world, but they must certainly work for all they get."

The exorbitant fees requested by Houlihan Lokey and Tudor Pickering are similar to the "appearance fees" which certain of the world's top athletes—for example, Tiger Woods—are able to command. However, unlike Tiger Woods, whose presence does guarantee a financial benefit at any event where he appears, neither of these two investment banking firms introduced any testimony or exhibits guaranteeing some benefit to the estate in this case. They expect to be paid an appearance fee for simply showing up—not only do they not guarantee success; they do not even guarantee they will work a minimum number of hours in order to try to achieve success. This Court will therefore not approve the payment of their requested "appearance fees." Tudor Pickering is not Tiger Woods. Nor is Houlihan Lokey.

In *In re Mirant Corp.*, 354 B.R. 113 (Bankr. N.D. Tex. 2006), the Honorable D. Michael Lynn made some very telling comments about the integrity of the process with respect to financial advisors demanding guaranteed compensation under § 328:

---

[19] Wall Street (20th Century Fox 1987).

The court erred seriously in entering orders which left it so little discretion in assessing the work of the financial advisors. Though the court was given to understand Debtors and the Committees could not obtain competent financial advisors without assurance that there would be substantial "success" bonuses, whether or not each advisor could show it had earned such a fee, the court has since learned that some financial advisors, at least, will accept more conventional arrangements in terms of compensation. *In the future, the court hopes and expects that parties in large chapter 11 cases in this and other districts will seek out financial advisors that are willing to have their work judged on a basis similar to the rules applied to other professionals.*

*In re Mirant*, 354 B.R. at 128 (emphasis added).

In effect, Judge Lynn has recommended that parties in large Chapter 11 cases should call the bluff of investment bankers who make Shermanesque statements that they will only provide services pursuant to a huge, guaranteed fee approved under § 328. Judge Lynn is urging parties to respond to these investment bankers by telling them that if they will not work under the more conventional arrangements pursuant to § 330, or at least pursuant to reasonable fee arrangements under § 328, then the parties will find one or more of their competitors who will. Implicit in Judge Lynn's remarks is that if the parties themselves give in to these investment bankers, then the bankruptcy courts themselves must call the bluff of these financial advisors and challenge them to accept reasonable fee arrangements.

This Court shares Judge Lynn's concerns about the integrity of the process and also accepts his remarks and advice.[20] Given the state of the record in this case, this Court will not approve the proposed enormous fees for Houlihan Lokey or Tudor Pickering, but rather chooses to call their

---

[20] No person—and certainly no sitting judge—enjoys admitting that he or she has erred. Yet, Judge Lynn did exactly that in *Mirant* by stating that he should not have approved fee arrangements which left him very little discretion in assessing the work of the financial advisors. Judge Lynn conceded that he erred in order to emphasize to the bench, the bar, and committee members in other large Chapter 11 cases that they should be highly skeptical about engaging and approving advisors who insist on being employed under terms less stringent than those terms normally applied to all other professionals in bankruptcy. Judge Lynn's willingness to concede his mistake in order to educate others and improve the bankruptcy system underscores his own high integrity and brilliance.

bluff. Every other key professional in this case—including the investment banking firm of Parkman Whaling—has agreed to reasonable fee arrangements that are governed by, among other orders, the Procedure for Professionals Order, the Cash Collateral Order, and the Budget. Given the state of the record, there is no good reason why Houlihan Lokey and Tudor Pickering should be exempt from these same reasonable compensation arrangements. This Court does not want to make the error (about which Judge Lynn cautions in *Mirant*) of approving the Applications and later learning that some other financial advisors would have accepted much more reasonable compensation arrangements, which include agreeing to oversight by this Court. *See id.* Indeed, given that Parkman Whaling, an investment banking firm every bit as competent and qualified as Houlihan Lokey and Tudor Pickering, was willing to work for a reasonable fee, this Court's approval of the compensation schemes proposed by Houlihan Lokey and Tudor Pickering would not only be an error; it would be a gross error.[21]

For all of the reasons set forth herein, the Houlihan Lokey Application and the Tudor Pickering Application should both be denied. An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 28th day of July, 2009.

Jeff Bohm
United States Bankruptcy Judge

---

[21] In fact, after the Court orally denied the applications on July 16, 2009, counsel for the Equity Holders' Committee and the Unsecured Noteholders' Committee subsequently informed this Court at a hearing held on July 24, 2009, that Tudor Pickering and Houlihan Lokey had both decided to provide services to the committees and thereafter seek compensation pursuant to § 330. Thus, Judge Lynn's admonition to be highly skeptical when being told that a professional will only accept employment under less stringent terms than other professionals turns out to be very sage advice.