IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
09/15/2009

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ENERGY PARTNERS, LTD., et al., | § | Case No. 09-32957-H4-11 |
| | § | |
| Debtors. | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION ON JOINT MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED NOTEHOLDERS OF ENERGY PARTNERS, LTD., *ET AL.* AND
HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. TO AMEND THE
COURT'S MEMORANDUM OPINION ON: (1) EMERGENCY APPLICATION OF THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR ENTRY OF AN
ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF TUDOR
PICKERING HOLT & CO. SECURITIES, INC. AS VALUATION CONSULTANT FOR
THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS *NUNC PRO TUNC*
TO JUNE 30, 2009; AND (2) EXPEDITED APPLICATION FOR AN ORDER TO
RETAIN AND EMPLOY HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.
AS FINANCIAL ADVISORS TO THE OFFICIAL COMMITTEE OF UNSECURED
NOTEHOLDERS OF ENERGY PARTNERS, LTD., *ET AL.*, *NUNC PRO TUNC* TO THE
EFFECTIVE DATE**
[Docket No. 386]

### I. INTRODUCTION

On July 15, 2009, two investment banking firms came before this Court and requested

emergency approval of their retention under 11 U.S.C. § 328(a), the terms of which called for each

of them to immediately receive an up-front, nonrefundable fee of $500,000.00.  Thus, for merely

becoming engaged in the case, the debtor's estate would be drained by $1,000,000.00.

This Court orally denied the firms' request and thereafter wrote a memorandum opinion

expounding on the reasons for its decision (the Opinion).  One of these investment banking firms,

Houlihan Lokey Howard & Zukin Capital, Inc. (Houlihan Lokey), and the Official Committee of

Unsecured Noteholders (the Committee) which sought to employ it, have now filed a joint motion

to amend the Opinion. They are unhappy because, among other things, the Opinion referred to the investment bankers as greedy, arrogant hogs.[1] Their motion to amend requests this Court to unsay what it said and to unwrite what it wrote. This, the Court will not do. Houlihan Lokey and the Committee (collectively, the Movants) have added nothing to the record made at the July 15, 2009 hearing, and have failed to satisfy the requirements necessary to amend the Opinion.

Indeed, the record made at the July 15 hearing was sparse. At that hearing, the testimony of the one witness who appeared in support of Houlihan Lokey's retention primarily consisted of conclusory statements. Certain statements gave this Court pause. For example, Tom A. Howley (Howley), counsel for the Committee, when proffering this witness's testimony, emphasized to the Court that it had to immediately approve Houlihan Lokey's retention under § 328(a) so that this firm could "swoop in here and work on this for three weeks." [July 15, 2009 Tr. 44:19–20.] In fact, Howley repeatedly used the phrase "swoop in" to describe the approach that Houlihan Lokey would take. It is no small irony that "swoop" is defined as "a very rapid raid" because that is how this Court viewed then, and views today, the business strategy of Houlihan Lokey in this case.[2] In this Court's eyes, Houlihan Lokey attempted to raid the debtor's coffers by suddenly swooping in and swiftly scooping out unseemly sums of cash from the estate. In other words, Houlihan Lokey was a greedy hog. The Court declines to amend the Opinion.

---

[1] In the Opinion, this Court referred to the Fifth Circuit's use of the phrase "[W]hen a pig becomes a hog it is slaughtered," in characterizing Houlihan Lokey as a hog. *Swift v. Bank of San Antonio (In re Swift)*, 3 F.3d 929, 930 (5th Cir. 1993). Given that the Fifth Circuit itself has used the word "hog" to characterize the principle of "too much," this Court believes that it is entirely appropriate to use the word "hog" in reference to Houlihan Lokey. The Court's reference to the word "greedy" is derived from one definition of the word "hog"—i.e., "to take in excess of one's due." Miriam-Webster's Collegiate Dictionary 550 (10th ed. 1993).

[2] Wordnet: An Electronic Lexical Database (Christine Fellbaum, ed., MIT Press 1998), *available at* http://wordnet.princeton.edu.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[3]  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such.  Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.  The facts are set out in the Opinion, entered on the docket on July 28, 2009.  Set forth below are the facts which this Court finds pertinent to the pending motion to amend.

## II. FINDINGS OF FACT

On May 1, 2009, Energy Partners, Ltd. (the Debtor), a publicly-held entity in the oil and gas business, filed a voluntary Chapter 11 petition on behalf of itself and its affiliated entities.[4]  Eleven days later, the Debtor filed an Expedited Application for Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment and Retention of Parkman Whaling LLC as Financial Advisors for the Debtors, *Nunc Pro Tunc* to the Petition Date (the Parkman Whaling Application).  [Docket No. 122.]  The Court expressly approved the terms of the engagement letter between the Debtor and Parkman Whaling LLC (Parkman Whaling) in its order granting the Parkman Whaling Application.  [Docket No. 176.]  The amount of monthly compensation that the Court approved was $75,000.00, plus expenses.  Additionally, the Court approved the following compensation for Parkman Whaling: (1) if the Debtor required a financing transaction, Parkman Whaling would act as the Debtor's

---

[3] Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.  Any reference herein to "the Code" refers to the United States Bankruptcy Code.  Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.  Reference to a "Rule" refers to the Federal Rules of Civil Procedure.

[4] The other debtor entities include Delaware EPL of Texas, LLC; EPL of Louisiana, L.L.C.; EPL Pioneer Houston, Inc.; EPL Pipeline, L.L.C.; and Nighthawk, L.L.C.

exclusive agent and receive a percent-based transaction fee; (2) if the Debtor required a restructuring transaction, Parkman Whaling would act as the Debtor's exclusive agent and receive a cash fee equal to $2,000,000.00; (3) in connection with any mergers and acquisitions transaction, Parkman Whaling would act as the Debtor's exclusive agent, and receive a percentage-based transaction fee; and (4) Parkman Whaling would be entitled to recover ten percent of any break-up fee received by the Debtor in connection with any transaction. [Docket No. 122-2.] Outside of the $75,000.00 monthly fee, these fees are contingent upon certain events actually occurring. To date, the professional services that Parkman Whaling has provided include, among other things, developing an enterprise valuation for the Debtor.[5]

On June 16, 2009, the Court approved the Debtor's Second Amended Disclosure Statement and set the confirmation hearing for July 29, 2009. [Docket No. 231.] The Second Amended Disclosure Statement referenced both the Parkman Whaling report and the Birch Run report,[6] which contained competing valuations of the Debtor. Parkman Whaling's enterprise valuation of the Debtor concluded that no residual value existed for the equity holders; [Docket No. 222, p. 76]; whereas, Birch Run's appraisal valued the Debtor's common shares at approximately

---

[5] While the Court does not presently have a comprehensive list of Parkman Whaling's accomplishments on the record, Parkman Whaling's retention letter states that it expects to engage in the following services: (a) evaluate the Debtor's strategic options based upon Parkman Whaling's initial review; (b) advise the Debtor as to potential mergers or acquisitions, and the sale of assets or the business; (c) advise the Debtor generally as to the available financing and capital restructuring alternatives, including recommendations of specific courses of action; (d) assist the Debtor with the development, negotiation, and implementation of the Debtor's Chapter 11 plan of reorganization or liquidation (the Plan); and (e) assist the Debtor with the design of any debt and equity securities or other consideration to be issued in connection with the Plan. [Docket No. 122-2.]

[6] As of the date of the hearing on the Debtors' Motion to Approve Disclosure Statement, Birch Run Capital, LLC (Birch Run) was the investment manager for a holder of common stock in the Debtor. [Docket No. 209.]

4

$212,000,000.00. [Docket No. 222, p. 88.] Thus, several weeks prior to the Plan confirmation hearing, there were two competent and competing appraisals already in existence.

On July 14, 2009, the Committee sought to employ Houlihan Lokey by filing its Expedited Application for an Order to Retain and Employ Houlihan Lokey as Financial Advisors to the Committee *Nunc Pro Tunc* to the Effective Date (the Houlihan Lokey Application). [Docket No. 309.][7] The proposed fee terms in the Houlihan Lokey Application were, among other terms, as follows: (a) a nonrefundable fee of $500,000.00 to be paid immediately; (b) a nonrefundable additional fee of $100,000.00 for the period from August 1, 2009 through August 15, 2009; (c) a nonrefundable additional fee of $100,000.00 for the period from August 16, 2009 through August 31, 2009; and (d) any out-of-pocket business expenses. [Docket No. 309, ¶ 16.] Pursuant to the Houlihan Lokey Application and Houlihan Lokey's engagement letter, services would include, but were not limited to: (a) evaluating the Debtor's debt capacity and enterprise valuation; (b) analyzing the Debtor's business plans and forecasts; (c) evaluating the Debtor's assets and liabilities; (d) analyzing and reviewing the Debtor's financial and operating statements; (e) assessing the financial issues and options concerning the Plan; (f) providing financial analysis; (g) negotiating with the Debtor and third parties; and (h) providing testimony both in court and in depositions. [Docket No. 309, ¶ 15.] While the Houlihan Lokey Application and engagement letter may list multiple tasks, Houlihan Lokey's representative admitted in his testimony that "the primary focus is going to be on

---

[7] On July 13, 2009, another committee, the Equity Holders' Committee, filed its own application to employ the investment banking firm of Tudor, Pickering, Holt & Co. Securities, Inc. (Tudor Pickering). [Docket No. 304.] The Opinion also reviewed why Tudor Pickering's proposed retention was denied. Tudor Pickering and the Equity Holders' Committee, however, have chosen not to request this Court to amend the Opinion. Therefore, only the facts regarding these two parties-in-interest that are directly related to the Houlihan Lokey Application will be referenced in this Memorandum Opinion. Otherwise, this Memorandum Opinion will not address the facts regarding the Equity Holders' Committee's unsuccessful effort to retain Tudor Pickering.

valuation." [July 15, 2009 Tr. 31:24–25.] Indeed, Houlihan Lokey would likely have little time to do anything else. [July 15, 2009 Tr. 31:25–32:1.]

Two parties filed written objections to the Houlihan Lokey Application, objecting, among other things, that the proposed fees were grossly excessive, nonrefundable, and immune from this Court's oversight. [Docket Nos. 310, 311, 315, & 316.] The parties which filed written objections were: (1) Bank of America, N.A., as agent for itself and on behalf of the Prepetition Secured Lenders (the Bank); and (2) the Official Committee of Unsecured Creditors (the UCC).

On July 15, 2009, this Court held a hearing on, among other matters, Houlihan Lokey's Application. In support of Houlihan Lokey's Application, the Court heard testimony from Adam Lee Dunayer (Dunayer), a manager at Houlihan Lokey. Dunayer was the only witness to give testimony on behalf of the Houlihan Lokey Application.

Howley, in his capacity as Committee counsel, proffered the testimony of Dunayer in support of the Houlihan Lokey Application. Dunayer gave no testimony regarding Houlihan Lokey's hourly rates, and made no fee comparison of Houlihan Lokey's fees with fees of competing firms for similar projects within the same or similar time frame. Dunayer described only other matters on which Houlihan Lokey has been retained. [July 15, 2009 Tr. 31:17–20.] Further, instead of providing the Court with specific information about the Committee's negotiations with Houlihan Lokey and competing firms, Dunayer's testimony provided only conclusory testimony that "[t]he engagement letter was the culmination of rather robust negotiations between the committee and Houlihan Loke [sic]." [July 15, 2009 Tr. 32:4–6.] The proffered testimony additionally claimed—once again, in a conclusory statement—that the Committee "negotiated this fee structure very vigorously." [July 15, 2009 Tr. 32:9.]

6

Howley himself gave no testimony, but stated at the podium that the Committee had considered the hiring of an investment banking firm in March of 2009, but had declined to do so at that time. He further stated that it was not until the Equity Holders' Committee sought to engage an investment bank that the Committee concluded it had no choice but to engage its own firm. The rationale was that a separate firm was needed in order to rebut appraisal testimony the Equity Holders' Committee might adduce from its own investment bank. [July 15, 2009 Tr. 29:1–10.]

Continuing, Howley stated that the Committee already supported the Plan, but disagreed with the existing competing valuations and strongly disputed that there was equity in the Debtor. Specifically, Howley—not while proffering the testimony of Dunayer, but rather making arguments from the podium as to why this Court should approve the Houlihan Lokey Application—stated that:

> The primary driver of this application is the recent formation of the equity committee and their announced intention to hire a valuation consultant, and, at a minimum, engage in discussions about valuation and the potential for litigation over valuation.
>     . . . .
> . . . [W]e need approval today, your Honor, to hire a financial advisor. Every day between now and the confirmation hearing is critical to get prepared to either engage in negotiations or potential litigation, if we have to, over the plan confirmation, and we need the financial advisor hired pursuant to 328(a).
>     I think it's critical in this type of project for this financial advisory firm to swoop in here and get ready . . . . [T]hey're going to have to take people off existing projects and devote themselves full-time to this project. In order to do that, Judge, they need the assurance that they're going to get paid at the end of the day, and that's where 328(a) comes in and that's where it is regularly used to provide that assurance.

[July 15, 2009 Tr. 29:06–30:3.] Howley then resumed proffering the testimony of Dunayer, noting that "I also have been informed that 328(a) is a prerequisite for Houlihan to swoop in here and provide this service." [July 15, 2009 Tr. 32:25–33:2.]

Howley subsequently finished Dunayer's proffer with the following:

7

> Judge, the only thing I was going to add before Mr. Zdunkewicz [counsel for the Official Committee of Equity Security Holders] came up [to the podium] as well that I didn't include in Mr. Dunayer's proffer because he is not aware of this [sic] is all the financial advisors that we discussed and talked to, condition precedent, 328(a). You know, it's no secret what the economy is like out there. These guys that are sought after and are the marquis names in this industry are busy. And in order to take on a project like this that is not your conventional retention, and we admit that, they need to get 328(a) approval for them to swoop in and work on this for three weeks.

[July 15, 2009 Tr. 44:10–20.]

Finally, Howley, again making argument—as opposed to proffering Dunayer's testimony—delivered the following comments:

> [T]he lack of objection [to the Plan] from the [Unsecured] noteholders [Committee] should not be construed as any message that there is equity value here.
>
> . . . .
>
> We strongly dispute that.
> There's also been some references here today that the noteholders are simply on board with Parkman Whaling's valuation. That's not correct either, your Honor. What we're on board with is the plan and the treatment afforded the noteholders. That's separate and apart from the valuation that Parkman has put out there. We are not on board with Parkman Whaling's valuation at this point; that's why we're hiring our own expert, to independently conduct a valuation.
> But just in summary, your Honor, we are not objecting to Tudor Pickering but that should not be misconstrued that we in any way recognize that there is equity value here.

[July 15, 2009 Tr. 69:11–70:1.]

Certain parties took issue with Houlihan Lokey's Application, either in writing or orally.[8]

Michael Farquhar, counsel for the Bank, cogently argued that "[i]f this settles in a week, that 328 approval is still solid, and that causes us an issue, your Honor. We want this Court to be able to look

---

[8]  The Bank and the UCC filed written objections. Then, at the July 15 hearing, Fortis Capital Corporation orally joined in the Bank's objection.

at what they did and approve or disapprove the fee. Very simple."[9] [July 15, 2009 Tr. 35:13–35:16.]
Moreover, Ross Spence, counsel for the UCC, was "concerned about a million dollars going out the
door for two valuation experts."[10] [July 15, 2009 Tr. 36:15–16.] Jeff LeForce, counsel for Fortis
Capital Corporation, echoed the concerns expressed by both Messrs. Farquhar and Spence and joined
in the Bank's objection. [July 15, 2009 Tr. 36:4–6.] Finally, even the Debtor expressed serious
reservations, as Paul Heath, counsel for the Debtor, noted that "my client, my board, is not thrilled
about the cost that's going to be incurred here."[11] [July 15, 2009 Tr. 38:12–13.]

At the close of the July 15 hearing, the Court took the matter under advisement. [July 15,
2009 Tr. 71:6–7.] On July 16, 2009, the Court held a hearing and issued its oral ruling denying
approval of the Houlihan Lokey Application. [Docket No. 381.] On July 28, 2009, the Court issued
the Opinion on the Application and the order denying the Application. [Docket Nos. 366 & 367.]

---

[9] Farquhar's use of the phrase "if this settles" referenced negotiations among various parties about pending
objections to the Plan, and whether a consensual Plan could be achieved. As of the July 15 hearing, the following parties
had objected to confirmation of the Plan: (1) Cypress-Fairbanks Independent School District, Harris County, Matagorda
County, and Palacios Independent School District; (2) BNP Paribas; and (3)Fortis Capital Corporation. [Docket Nos.
337, 339 & 340.]

[10] Spence's expressed concern about "a million dollars going out the door for two valuation experts" was a
reference to the proposed nonrefundable retention fee of $500,000.00 for Houlihan Lokey and another $500,000.00 for
Tudor Pickering.

[11] The Debtor, perhaps walking a fine line between keeping the Committee on its side in support of the Plan
while fulfilling its duties to avoid needless and extravagant expenditure of estate funds, did not lodge a written objection
to Houlihan Lokey's Application. *See In re Phillips*, 966 F.2d 926, 929 (5th Cir. 1992) ("Creditors are wholly dependent
on the party controlling an estate in bankruptcy proceedings to protect their interests."). Rather, the Debtor, through
its counsel, chose to express itself by verbally informing the Court on the record at the July 15 hearing that the Debtor's
board of directors was acutely aware of, and concerned about, the proposed fees.

On August 10, 2009, the Movants filed the joint motion to amend (the Motion to Amend).[12] [Docket No. 386.] On August 14, 2009, the UCC filed a Response in opposition to the Motion to Amend. [Docket No. 397.]

### III. CONCLUSIONS OF LAW

**A.   Jurisdiction and Venue**

The Court has jurisdiction over the matters raised in the Motion to Amend pursuant to 28 U.S.C. §§ 157(a) and 1334(b).   This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M), and (O).[13]   Additionally, this matter is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See Southmark Corp. v. Coopers & Lyband (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, No. 06-3556, 2006 WL 3805670, at \*19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) even if § 157(b)(2) does not specifically list it). Venue is proper pursuant to 28 U.S.C. § 1408(1).

---

[12]   In full, the Motion to Amend is captioned as the "Joint Motion of the Official Committee of Unsecured Noteholders of Energy Partners, Ltd., *et al.* and Houlihan Lokey Howard & Zukin Capital, Inc. to Amend the Court's Memorandum Opinion On: (1) Emergency Application of the Official Committee of Equity Security Holders for Entry of an Order Authorizing the Employment and Retention of Tudor Pickering Holt & Co. Securities, Inc. as Valuation Consultant for the Official Committee of Equity Security Holders *Nunc Pro Tunc* to June 30, 2009; and (2) Expedited Application for an Order to Retain and Employ Houlihan Lokey Zukin Capital, Inc. as Financial Advisors to the Official Committee of Unsecured Noteholders of Energy Partners, Ltd., *et al.*, *Nunc Pro Tunc* to the Effective Date."

[13]   28 U.S.C. 157(b)(2)(A) refers to "matters concerning the administration of the estate." At the time this Court issued its ruling on the Houlihan Lokey Application, the Plan had not yet been confirmed; therefore, the Debtor's estate was still in existence.

10

B.      **Construing the Motion to Amend**

The Movants incorrectly brought their Motion to Amend under Rule 59. "Rules 52(b) and 59 both allow a party to move in the district court for an amendment of its findings." 12 James Wm. Moore et al., Moore's Federal Practice § 59.05 [6] (3d ed. 2007). A Rule 59(e) motion requests an alteration or amendment of a *judgment or order*. Fed R. Civ. P. 59(e).[14] "In contrast, a Rule 52(b) motion seeks only the correction of findings or the finding of the additional facts without the amendment of the judgment." 12 James Wm. Moore et al., Moore's Federal Practice, at § 59.05[6]. As such, the Movants should have (1) requested for amendment of the Opinion's findings of fact pursuant to Bankruptcy Rule 7052—which makes Rule 52 applicable to adversary proceedings—or in the alternative, (2) requested amendment of the order in conjunction with the Motion to Amend.[15]

The Motion to Amend was incorrectly brought pursuant to Rule 59(e) because it failed to request that the Court modify the order. Justice requires the Court, however, to construe the Motion to Amend as if the Movants had correctly requested relief pursuant to Rule 59. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."); *N. Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 918 (5th Cir. 1996) (allowing the district court to construe a motion as a Rule 59(e) motion when the motion was incorrectly captioned, as long as the requirements of Rule 59(e) were met); *see also Askanase v. Lawley (In re Lawley)*, No. 05-03296, 2006 WL 2090209, at *2 (Bankr. S.D. Tex. June 30, 2006) (construing a Bankruptcy Rule 8015 motion to amend as a Bankruptcy Rule 9023 motion to amend); *In re Hubbard*, 333 B.R. 373, 376 (Bankr. S.D. Tex. 2005)

---

[14]  Rule 59 is made applicable to bankruptcy cases pursuant to Bankruptcy Rule 9023.

[15]  Rule 52 also applies to contested matters, thus making the Rule applicable here. Fed. R. Bankr. P. 9014(c).

(finding that all pleadings must be construed as to do substantial justice). Here, the Motion to

Amend requests that the Court "grant any other relief this Court deems just and proper." [Docket

No. 386, p. 17.] Although the Court construes the request for just and proper relief as a request to

amend the order denying the Houlihan Lokey Application (the Order) in compliance with Rule 59(e),

the Court denies the Motion to Amend for the following reasons:

## C.        Application of Rule 59(e) to the Motion to Amend

The Motion to Amend is properly construed as a motion brought pursuant to Bankruptcy

Rule 9023, which incorporates Rule 59. *Strangel v. United States (In re Strangel)*, 68 F.3d 857, 859

n.1 (5th Cir. 1995); *Fellows v. Colonial Sav. & Loan Ass'n (In re Fellows)*, 19 F.3d 245, 246 (5th

Cir. 1994); *Abraham v. Aguilar (In re Aguilar)*, 861 F.2d 873, 875 (5th Cir. 1988). A Rule 59(e)

motion throws doubt on the soundness of a judgment. *Templet v. Hydrochem Inc.*, 367 F.3d 473,

478–79 (5th Cir. 2004) (citing *In re TransTexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). "A

motion to alter or amend the judgment under Rule 59(e) must clearly establish either a manifest error

of law or fact or must present newly discovered evidence and cannot be used to raise arguments

which could, and should, have been made before the judgment was issued." *Royce Homes, L.P. v.

Decker Oaks Dev. II, Ltd. (In re Decker Oaks Dev. II, Ltd.)*, No. H-08-2070, 2009 WL 2016937, at

*3 (S.D. Tex. July 6, 2009) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir.

2003)) (internal quotation marks omitted); *see also Pluet v. Frasier*, 355 F.3d 381, 384 n.2 (5th Cir.

2004); *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990). "[A] court has the discretion

to amend its previous . . . order if the movant establishes some manifest error of law or fact justifying

such an amendment." *In re SI Restructuring, Inc.*, No. 04-54504-LMC, 2008 WL 1927034, at *1

(Bankr. W.D. Tex. Apr. 24, 2008) (citing *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir.

1989)). Additionally, Rule 59(e) relief is appropriate when a change has occurred in the controlling law. *Royce Homes*, 2009 WL 2016937, at *3 (citing *Schiller v. Phys Res. Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003)).  The Fifth Circuit, however, has warned courts that altering, amending, or reconsidering a judgment under Rule 59(e) is an *extraordinary* remedy that courts should rarely use. *Templet*, 367 F.3d at 479.

Additionally, this Court has discretion to grant a new trial pursuant to Rule 59(e) "to prevent an injustice." *Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 774 (5th Cir. 1995) (quoting *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993)) (internal quotation marks omitted).

Because amending or reconsidering a ruling pursuant to Rule 59(e) is such an extraordinary remedy, the Rule 59(e) standard "favors denial of motions to alter or amend a judgment." *S. Constr. Group, Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993).  Indeed, Rule 59(e) favors denial because "manifest error" is typically defined as "[e]vident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evidence, and self-evidence." *In re Good*, No. 08-40955, 2009 WL 1024651, at *5 (Bankr. E.D. Tex. Apr. 13, 2009) (quoting *Bank One, Tex., N.A. v. F.D.I.C.*, 16 F. Supp. 2d 698, 713 (N.D. Tex. 1998)).  Black's Law Dictionary defines manifest error as "plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." Black's Law Dictionary 653 (7th ed. 1999).  Under these definitions, the Court concludes that the Opinion contains neither a manifest error of fact nor a manifest error of law.

1.    **The Movants have chosen to introduce no new evidence; nor have they shown any change in the controlling law; nor have they demonstrated that any injustice would occur if the relief requested was not granted.**

The Movants have introduced no new evidence.  Indeed, in their Motion to Amend, the Movants expressly assert that "[g]iven the nature of the relief sought herein, the Movants do not believe that an oral hearing on this matter is necessary," [Docket No. 386, p. 15–16, ¶ 30], thereby telegraphing to this Court that they have no new evidence to introduce.   Therefore, the Court will not amend the Opinion on the grounds that there is new evidence.[16]

Further, the Movants have not asserted that there has been a change in the controlling law, nor has this Court itself become aware of any such change.  Therefore, the Court will not amend the Opinion on these grounds.

Additionally, no injustice would be prevented by amending the Opinion to endorse Houlihan Lokey's request as a reasonable one.  Indeed, this Court believes that amending the Opinion so that it approves, endorses, or otherwise favors—directly or indirectly—a nonrefundable, up-front fee that could reach $700,000.00 would be a palpable injustice, particularly given the sparse record in the case at bar.

---

[16]   In the Motion to Amend, the Movants state that "Should the Court deem it necessary to hear oral arguments with respect to the Motion, Movants will appear before the Court." [Docket No. 386 p. 16, ¶ 30.]  This Court will not inject itself into what it believes is trial strategy of the Movants.  It is their decision, not the Court's, to determine whether they want to have a hearing  to introduce evidence and make additional oral arguments; or not to have a hearing and rest on the arguments made in the Motion to Amend.  Having represented to this Court that they do not believe an oral hearing is necessary, this Court concludes that they have chosen the latter approach.  Accordingly, the Court issues this Memorandum Opinion based upon the arguments articulated in the Motion to Amend.

2.     **The Movants have not clearly established a manifest error of fact.**

   a.     **The Movants have not clearly established that this Court made a manifest error of fact when it compared Parkman Whaling's fees to Houlihan Lokey's fees in determining if Houlihan Lokey's proposed fees were reasonable.**

In the Motion to Amend, the Movants complain that the Opinion relied upon an "inaccurate comparison between the fees agreed to by the Noteholders' Committee and Houlihan Lokey and fees previously approved by the Court for Parkman Whaling." [Docket No. 386, p. 9, ¶ 16.] The Movants allege that the following findings of fact this Court made are not supported by the record: (1) that Parkman Whaling's fees, at $75,000.00 per month, were substantially lower than Houlihan Lokey's proposed fees; (2) that Houlihan Lokey failed to demonstrate why it should be treated more favorably than Parkman Whaling; and (3) that Houlihan Lokey demanded "far more exorbitant terms" than Parkman Whaling. [Docket No. 386, p. 10, ¶ 17.]

The Movants argue that the Court erred in finding Parkman Whaling's fees substantially lower than Houlihan Lokey's proposed fees. In support thereof, the Movants note that Parkman Whaling is entitled to earn financing transaction fees, restructuring transaction fees, and mergers and acquisitions transaction fees. Further, Parkman Whaling is entitled to earn an additional $2,000,000.00 upon confirmation of the Plan. [Docket No. 386, p. 9, ¶ 16.] The Movants are correct in saying that this Court simply cannot ignore Parkman Whaling's *earned* compensation when comparing Parkman Whaling's compensation and Houlihan Lokey's proposed fees. This Court does not ignore it today, and it did not ignore it in the Opinion. *In re Energy Partners, Ltd.*, 2009 WL 2366104, at *2 n.4 (Bankr. S.D. Tex. July 28, 2009) ("Parkman Whaling is also entitled to certain fees under the engagement letter, *but these fees are contingent upon certain events actually*

15

*occurring.*") (emphasis added).  Parkman Whaling's fees and Houlihan Lokey's proposed fees are quite distinguishable.

Houlihan Lokey requested the following fees: (a) a nonrefundable initial fee of $500,000.00; (b) a nonrefundable additional fee of $100,000.00 for Houlihan Lokey still being retained from August 1, 2009 through August 15, 2009; (c) a nonrefundable additional fee of $100,000.00 for Houlihan Lokey still being retained from August 16, 2009 through August 31, 2009; and (d) any out-of-pocket business expenses. [Docket No. 309, ¶ 16.] Houlihan Lokey was not required to provide any work to obtain its initial fee of $500,000.00. Moreover, the only event that needed to occur for Houlihan Lokey to obtain its additional fees was the passage of time with no settlement.

In stark contrast, Parkman Whaling must *earn* its additional fees. Certain events must take place.  For example, the Plan must actually be confirmed for Parkman Whaling to receive $2,000,000.00.[17]

Therefore, because Parkman Whaling's fees were contingent on actual services being provided that led to tangible, identifiable, and material benefits—for example, obtaining confirmation of the Plan—to the Debtor's estate, this Court made no manifest error of fact in finding that Parkman Whaling's fees are more reasonable than the proposed fees that Houlihan Lokey insisted upon, and that Houlihan Lokey's proposed fees were unreasonable.

---

[17] In fact, in no small part due to the fact that Parkman Whaling had already done its valuation report and served as advisor to the Debtor, the Plan was confirmed orally from the bench on July 29, 2009 and in a written order docketed on August 3, 2009. [Docket No. 380.] Although objections to the Plan were initially filed, a consensual Plan was achieved through negotiations. The parties that had lodged objections—and those who had not yet done so but were preparing to file objections— knew that if settlement did not occur, the Debtor would attempt to obtain confirmation of the Plan on a cramdown basis; and these parties knew also that the Debtor would use the Parkman Whaling valuation to support confirmation of the Plan. Thus, the actual efforts of Parkman Whaling, in both producing its valuation and in giving counsel to the Debtor, assisted the Debtor not only in preparing for the confirmation hearing and in negotiating a consensual Plan, but also in telegraphing to objecting parties that the Parkman Whaling valuation would be introduced into evidence if it was necessary to go forward on a cramdown basis.

**b.     The Movants have not clearly established that this Court made a manifest error of fact in its other findings regarding Houlihan Lokey.**

The Movants take exception to how the Court characterized Houlihan Lokey in the Opinion. Specifically, referring to this Court's comparison of Houlihan Lokey's proposed up-front, nonrefundable fee to an appearance fee for Tiger Woods, they assert that this Court made a manifest error of fact in the Opinion that Houlihan Lokey "expect[s] to be paid an appearance fee for simply showing up—not only do they not guarantee success; they do not even guarantee they will work a minimum number of hours in order to achieve success." *Energy Partners*, 2009 WL 2366104, at *2. In rebuttal, the Movants offer Howley's oral argument that Houlihan Lokey would be required to "take people off existing projects and devote themselves full-time to this project." *Id.* at *18.

The Movant's reliance on Howley's argument is misplaced. Rule 43, made applicable in bankruptcy cases by Bankruptcy Rule 9017, requires the testimony of witnesses to be taken under oath in open court. Statements by counsel not under oath, however, are argument and not evidence. It appears that the Movants have not heeded the message this Court has previously given in other opinions. "[M]ere . . . statements from counsel at the podium are not substitutes for introducing evidence to satisfy the requisite burden of proof." *Gulf Coast Band & Trust Co. v. Mendel (In re Mendel)*, 351 B.R. 449, 459 (Bankr. S.D. Tex. 2006). Morever, this message is by no means unique to this Court. Indeed, the Bankruptcy Court in the Northern District of Texas made it eminently clear that an attorney's statement in open court is argument and not evidence. *In re Armstrong*, 347 B.R. 581, 585 (Bankr. N.D. Tex. 2006) ("There was no evidence of an 'evidentiary link' . . . other than Stromberg's say so at the hearing, which is argument and not evidence."). The Third Circuit, the Second Circuit, and the Southern District of New York Bankruptcy Court have also ruled that oral

argument is not evidence. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 n.5 (3d Cir. 2004) ("We have repeatedly held that . . . arguments made . . . at oral argument are not evidence to be considered by this Court.") (quoting *Versarge v. Township of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993)) (internal quotation marks omitted); *Rexnord Holdings v. Bidermann*, 21 F.3d 522, 526 (2d Cir. 1994) (citing *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978)); *Bayerische Hypo-Und Vereinsbank AG v. Banca Nazionale Del Lavoro, S.p.A. (In re Enron Corp.)*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) (finding that oral argument is not evidence) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52 (1986)).

Howley's argument that "they're going to have to take people off existing projects and devote themselves full-time to this project," [July 15, 2009 Tr. 30:1–3], was made prior to Dunayer's proffer. As such, this statement is merely argument from the podium, and this Court may not—and will not—consider it evidence. Therefore, this Court has virtually no evidence regarding Houlihan Lokey's lost opportunity costs and the exigencies of its proposed employment. Additionally, there is no testimony at all as to the number of personnel to be used. Thus, the Court made no manifest error of fact in the Opinion that Houlihan Lokey's fees were unreasonable.

Next, the Movants take umbrage with the Court's characterization of Houlihan Lokey as a greedy, arrogant hog. [Docket No. 386, p. 12, ¶ 21.] The Movants assert that there is nothing in the record that suggests negotiations between the Committee and Houlihan Lokey were not at arms-length. The problem for the Movants is that on its face, a nonrefundable up-front fee of $500,000.00, plus the possibility of additional $100,000.00 payments every two weeks is, in this Court's eyes, sheer greed. The Movants simply failed to develop an adequate record proving

otherwise, opting instead to feed this Court conclusory, scant, self-serving, and hearsay testimony.[18] To carry their burden of showing that these fees did not equate to being a greedy, arrogant hog, the Movants needed to provide evidence: (1) explaining whether these proposed, nonrefundable, six-figure fees were customary within the investment banking industry; (2) detailing the extent of the negotiations that the Committee conducted with Houlihan Lokey, including, for example, whether written proposals were submitted back and forth, how many meetings were held, and who attended the meetings. The record only contains the conclusory statement that "rather robust negotiations" took place; [July 15, 2009 Tr. 32:5–6]; (3) describing the Committee's negotiations with other investment banks; (4) identifying the names of the other investment banks with whom the Committee conducted negotiations; and (5) setting forth whether the other investment banking firms would charge higher, lower, or the same level of fees for the services that were to be provided during the applicable time period.[19]

A party that provides only conclusory testimony, by definition lacking the necessary evidence to support the conclusions, will be unable to carry the burden of proof. *See Favre v. Lyndon Prop. Ins. Co. (In re Favre)*, No. 08-61003, 2009 WL 1885886, at *1 (5th Cir. July 1, 2009) (noting that affidavits setting forth conclusory facts are insufficient to defeat a motion for summary judgment)

---

[18] When Howley proffered that "all the financial advisors that we discussed and talked to, condition precedent, 328(a) [sic]," [July 15 Tr. 44:12–14], he relied on the out of court statements of the financial advisors to prove that § 328(a) was a condition precedent. This is rank hearsay. Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

[19] The only testimony this Court has regarding any details of other negotiations is Dunayer's proffered hearsay testimony that "all the financial advisors that we discussed and talked to, condition precedent, 328(a)." [July 15, 2009 Tr. 44:12–44:14.] This particular proffer was inartfully stated. The Court construed this particular proffer to mean that each and every investment banking firm with whom the Committee negotiated demanded, as an absolute condition of being retained, that the terms of the retention be approved under 11 U.S.C. § 328(a)—as opposed to under 11 U.S.C. § 330. Dunayer's proffered testimony failed to state the names of any other investment banking firms who allegedly demanded, as an absolute condition of being retained, that the terms of retention be approved under § 328(a).

(citing *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997)); *Orix Credit Alliance v. Harvey ex rel. Lamar Haddox Contractor (In re Lamar Haddox Contractor)*, 40 F.3d 118, 122 (5th Cir. 1994) (finding that conclusory testimony lacking necessary evidence was insufficient to establish a debtor's insolvency).  At the July 15 hearing, the Movants failed to carry their burden of showing that the proposed fees for Houlihan Lokey were, among other things, unreasonable; and thus adduced no additional testimony or introduced any exhibits in conjunction with this Motion to Amend.

Therefore, because this Court finds Houlihan Lokey's proposed fees to be facially exorbitant, and the Movants provided woefully insufficient evidence to convince this Court otherwise, the Court made no manifest error of fact characterizing Houlihan Lokey as greedy hogs.

3.     **The Movants have not clearly established a manifest error of law.**

a.     **The Movants have not clearly established that this Court made a manifest error of law when it applied *Pro-Snax* to 11 U.S.C. § 328(a).**

The Movants vigorously assert that *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998) does not apply to the retention and compensation of professionals under 11 U.S.C. § 328(a).  This Court disagrees.  *Pro-Snax* is not dictum and is indeed binding on this Court.  *Kaye v. Hughes & Luce, LLP*, No. 3:06-CV-01863-B, 2007 WL 2059725, at *12 (N.D. Tex. July 13, 2007).  This Court stands by the legal reasoning set forth in the Opinion.  *Energy Partners*, 2009 WL 2366104, at *14.  The Court reasoned that it must apply the *Pro-Snax* test to 11 U.S.C. § 328(a) applications, or else every professional would seek compensation under § 328(a) in an attempt to avoid the *Pro-Snax* test that is applicable to § 330.  *Id.*  Indeed, the Court found that § 328 applications require particularly close attention because

money paid to professionals under § 328 is extremely difficult, if not entirely impossible, to disgorge. *Id.*; *see Daniels v. Barron (In re Barron)*, 325 F.3d 690, 693–94 (5th Cir. 2003); *In re XO Commc'ns, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005); *In re Gillett Holdings, Inc.*, 137 B.R. 452, 460 n.22 (Bankr. Colo. 1991).

The Movants disagree with this reasoning. They argue that "contrary to the Court's concern that every professional would seek compensation pursuant to section 328(a), in fact the vast majority of professionals retained in bankruptcy cases cannot seek retention under 328(a)." [Docket No. 386, p. 13, ¶ 24 n.12.] The Court finds this statement to be rather disingenuous. Indeed, nothing in the language of § 328(a) supports the Movants' assertion. In part, § 328(a) states that: "The trustee, or a committee . . . with the court's approval, may employ . . . as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). There is nothing to suggest that the vast majority of professionals may not seek retention under § 328(a), and case law shows that they do exactly that. *See Comm. of Equity Sec. Holders of Federal-Mogul Corp. v. Official Comm. of Unsecured Creditors (In re Fed. Mogul-Global, Inc.)*, 348 F.3d 390, 408 (3d Cir. 2003) (allowing the retention of an accounting firm under § 328 on a monthly fee basis, but capping the fee to avoid duplicative and unnecessary services); *Hilal v. Williams*, No. H-05-3777, 2006 WL 2708048, at *8 (S.D. Tex. Sept. 19, 2006) (allowing retention of the law firm Porter & Hedges, L.L.P. under § 328(a)); *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 579 (Bankr. N.D. Tex. 2004) (noting that Houlihan Lokey was retained pursuant to § 328(a) while denying their request for a bonus beyond the terms of their engagement letter); *Riker, Danzig, Scherer, Hyland & Perretti LLP v. Official Comm. of Unsecured Creditors (In re Smart World Techs. LLC)*, 383 B.R.

869, 871, 879 (S.D.N.Y. 2008) (reversing a bankruptcy court's fee reduction of a law firm's fees when the law firm was employed pursuant to § 328(a)); *In re High Voltage Eng'g Corp.*, 363 B.R. 8, 17 (Bankr. D. Mass. 2007) (allowing compensation to a financial advisor pursuant to § 328(a)). Indeed, in the case at bar, a number of professionals have been retained pursuant to § 328(a).[20] Even Jones Day, counsel for the Committee, was retained pursuant to § 328(a). [Docket No. 318.] As such, the Movants' contention that the vast majority of professionals retained in bankruptcy cases cannot seek retention under § 328(a) holds little weight.

The Movants state that it is essentially impossible for a professional billing at an hourly rate to obtain retention under § 328(a). This Court disagrees. The hourly fees, like all fees under § 328(a), must simply pass the same factors discussed in the Opinion. *See In re Kurtzman*, 220 B.R. 538, 542 (S.D.N.Y. 1998) (allowing hourly attorneys fees under § 328(a) if the fees were similar to those charged by peer firms for comparable legal services).

The Movants also point out that "it should not be surprising that the 'material benefit' standard used to evaluate a professional's compensation under section 330 is not contained in the list of factors adopted by this Court in *In re High Voltage Engineering Corp.*, 311 B.R. 320, 333 (Bankr. D. Mass. 2004)."[21] In truth, it is not surprising that the court in *High Voltage* did not use the tangible, identifiable, and material benefit standard of *Pro-Snax*, though not for the reason the Movants imply. The *High Voltage* court was under no obligation to adopt the *Pro-Snax* test from

---

[20] Gary C. Hanna, as a consultant to the Committee, Alan D. Bell, as Chief Restructuring Officer for the Debtor, and Parkman Whaling were all retained pursuant to § 328(a). [Docket Nos. 171, 176, & 313.] This Court's approval of the retention of these professionals under § 328(a) should underscore that this Court has no misgivings about authorizing retention under this particular statute so long as, among other things, the requested fees do not fit within the category of outlandishness, as was the case with Houlihan Lokey's proposed fees.

[21] Under *Pro-Snax*, services must result in "an identifiable, tangible, and material benefit to the bankruptcy estate." *In re Pro-Snax*, 157 F.3d at 426.

22

the Fifth Circuit because the *High Voltage* court is a bankruptcy court within the First Circuit—and *Pro-Snax* is presently only controlling precedent within the Fifth Circuit.[22]  Additionally, this Court noted in its Opinion that the *High Voltage* factors are not exhaustive.  *Energy Partners*, 2009 WL 2366104, at *11.  Therefore, *High Voltage* not mentioning or applying the *Pro-Snax* test has no bearing on how this Court made its conclusions of law in the Opinion.

Further, the Movants argue that the terms of retention proposed for Houlihan Lokey at the July 15 hearing is precisely what § 328(a) sought to achieve: a guarantee of payment to protect bankruptcy specialists, thus protecting estates from less capable professionals.  *See In re Benassi*, 72 B.R. 44, 47 (D. Minn. 1987).  This Court disagrees.  Congress passed § 328(a) so that professionals have greater certainty of payment.  *Gibbs & Brun LLP v. Coho Energy, Inc. (In re Coho Energy, Inc.)*, 395 F.3d 198, 204 (5th Cir. 2004) (citing *Donaldson Lufkin & Jenrette Sec. Corp v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997)).  Houlihan Lokey was not an entity Congress intended § 328 to apply to because they were willing—albeit with some guarantees from the Committee—to work under § 330.[23]  Additionally, denying the retention

---

[22]  Indeed, there are some courts in other circuits who have expressly rejected the *Pro-Snax* test.  *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 132–33 (3d Cir. 2000) (rejecting *Pro-Snax* in favor of a less stringent test), *overruled on other grounds by Lamie v. United States Tr.*, 540 U.S. 526 (2004); *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet)*, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000) (holding that the statute does not require that a material benefit be provided to the estate, as set forth in *Pro-Snax*); *In re Byrd*, No-04-35620-TJC, 01-25006-TJC, 2007 WL 4287548, at *3 (Bankr. D. Md. Dec. 5, 2007) (noting that *Pro-Snax* is in conflict with the objective test applied in the Fourth Circuit).

[23]  On July 22, 2009, the Court held a hearing on the Debtor's Request for Emergency Status Conference on the Expedited Motion for Continuance of the Plan Confirmation.  At this hearing, Howley stated that, "Our expert, Houlihan Lokey, has communicated to us that they stand by their position that they want 328(a) approval.  We understand your Honor's ruling; we respect it.  So the arrangement that we're in the process of working out is that they will move forward under 330 and the appropriate provisions, but the noteholders are willing to essentially backstop their original fee request." [July 22, 2009 Tr. 11:21–12:2.]  Thus, Houlihan Lokey did not need the greater certainty of payment that § 328(a) provides.

of Houlihan Lokey does not protect the Debtor from less capable professionals. The Movants presented no evidence impugning the capabilities of Parkman Whaling, and therefore impugning the thoroughness and integrity of the Parkman Whaling valuation—which is the report reflecting the very position that the Committee has believed to be true all along: i.e., that the Debtor has no equity. Accordingly, this Court concludes that Houlihan Lokey's retention was not an entity Congress envisioned utilizing § 328(a).

The Movants assert that because of the significant differences between § 328(a) and § 330, *Pro-Snax* should not apply to § 328(a). While it is true that § 330(a) addresses compensation for services previously rendered, whereas § 328(a) addresses compensation for future services, that difference alone is not dispositive. The use of the word "reasonable" in § 330(a)(1)(A) and § 328(a) is quite helpful in this Court's statutory analysis. 11 U.S.C. § 330(a)(1)(A) allows a bankruptcy court to award a professional "*reasonable* compensation for actual, necessary services rendered." 11 U.S.C. § 330(a)(1)(A) (emphasis added). Additionally, § 328(a) permits retention of a professional "on any *reasonable* terms and conditions of employment." 11 U.S.C. 328(a) (emphasis added). The Supreme Court has established that "[i]dentical words used in different parts of the same act are intended to have the same meaning." *Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (quoting *Dept. of Revenue of Ore. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)). Indeed, the Third Circuit performed the same statutory analysis when permitting the bankruptcy court to apply § 330 factors when determining the reasonableness of fees under § 328(a). *In re Fed. Mogul-Global*, 348 F.3d at 407. Therefore, because *Pro-Snax* is used when determining the reasonableness of fees under § 330, this Court may apply the same test for § 328(a). Because this Court believes *Pro-Snax* must be used to analyze the reasonableness of proposed fees under § 328 in assessing Houlihan Lokey's

fees, this Court necessarily had to assess whether the services proposed to be provided by Houlihan Lokey would result in an identifiable, tangible, and material benefit to the Debtor's estate. Accordingly, no manifest error of law occurred when this Court concluded that the record was insufficient to establish how Houlihan Lokey's services would provide a tangible, identifiable, and material benefit to the estate.

Finally, the Movants argue that the legal standard this Court should adopt is a reasonableness standard, instead of the "identifiable, tangible, and material benefit" standard of *Pro-Snax*. *See Nat'l Gypsum*, 123 F.3d at 836 n.2; *In re Thermadyne Holding Corp.*, 283 B.R. 749, 755 n.9 (B.A.P. 8th Cir. 2002); *In re Metricom, Inc.*, 275 B.R. 364, 369 (Bankr. N.D. Cal. 2002); *High Voltage.*, 311 B.R. at 333. While this Court cited to all of these cases in its Opinion, the Court only adopted discrete points of law. Case law outside of the Fifth Circuit is not binding, but merely persuasive. *See Hawking v. Ford Motor Credit Co. (In re Consolidated Lewis Inv. Corp.)*, 210 F.3d 540, 548 (5th Cir. 2000). While *National Gypsum* is a Fifth Circuit case, it was written the year prior to *Pro-Snax*. Therefore, this Court concludes that *Pro-Snax* supplements *National Gypsum*. Thus, the Court believes it is correct in concluding that when determining whether to approve an application under § 328(a), it must consider, among other factors, whether the applicant is likely to provide services that will result in an identifiable, material, and tangible benefit to the estate.

While it is clear that the Movants disagree with this Court's conclusions of law, mere disagreement does not rise to the level of manifest error. The Movants' arguments fail to establish "plain and indisputable [error] [that] amounts to a complete disregard of the controlling law or the credible evidence in the record." Black's Law Dictionary 653 (7th ed. 1999). Therefore, this Court, in applying the standards of Rule 59(e), concludes that the Opinion contains no manifest error of law.

In sum, while the Movants disagree with this Court's ruling on Houlihan Lokey's proposed fees, this Court finds that the Movants have established none of the grounds for obtaining Rule 59(e) relief. *See Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 248 (5th Cir. 2006) (holding that the district court did not abuse its discretion in denying a Rule 59 motion where the movant simply disagreed with the court's prior ruling).

     **b.**     **In the alternative, even if this Court is incorrect in concluding that *Pro-Snax* applies when assessing a 11 U.S.C. § 328(a) application, and instead solely uses the reasonableness test propounded by the Movants, Houlihan Lokey's proposed fees are still untenable.**

The Movants request this Court to apply a general reasonableness standard and to apply *Pro-Snax* only to § 330 fee requests. *See Nat'l Gypsum*, 12 F.3d at 863 n.2 ("[S]ection 328 anticipates that the court make a determination as to the reasonableness of a fee arrangement at the beginning of a case.") (citing *In re Dividend Dev. Corp.*, 145 B.R. 651 (Bankr. C.D. Cal. 1992)). Even using only a reasonableness standard, however, this Court would still find that the fees proposed for Houlihan Lokey are unreasonable.

     i.     *Houlihan Lokey's proposed fees were not reasonable because the services to be rendered would have been duplicative.*

A number of courts have eliminated or reduced professionals fees for work that was found to be duplicative. *In re Casey*, 173 B.R. 893, 894 (Bankr. E.D. Tex. 1994) ("The Court cannot award duplicative fees for compensation.") (citing *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1299 (5th Cir. 1977)); *In re Fed. Mogul-Global*, 348 F.3d at 395 (capping 328(a) fees when the work was largely duplicative and constituted a burden on the debtor); *In re Malden Mills Indus.*, 281 B.R. 493, 501 (Bankr. D. Mass. 2002) (requesting attorneys to specifically address whether work was duplicative in future fee applications). Indeed, the Honorable D. Michael Lynn of the Northern

District of Texas Bankruptcy Court has warned professionals that fees sought for duplicative work would be reduced or eliminated. *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 221 (Bankr. N.D. Tex. 2009).

This Court finds that Houlihan Lokey's services would have been duplicative and therefore unreasonable. Here, two valuation reports already existed as of July 15—i.e., the date that the Committee came into this court requesting retention of Houlihan Lokey. The Parkman Whaling report concluded that no residual value would be available for the eligible equity interests. Conversely, the Birch Run report concluded that there would be substantial equity value for the equity interests. This Court has never seen any evidence casting doubt on the quality of either the Parkman Whaling valuation or the Birch Run valuation. Moreover, appraisals that disagree with one another are commonplace in both the business world and in the courtroom. Because there were already two competing valuations obtained by the Debtor and an equity security holder (i.e., Birch Run), this Court was well within its discretion to conclude that authorizing the Committee's proposed retention of Houlihan Lokey to generate a third valuation would be merely duplicative. If the two valuations had been in agreement as to the amount of remaining equity, then this Court might have found the Committee's desire to retain Houlihan Lokey more persuasive. However, this was not the case. Thus, even if this Court had applied solely the reasonableness standard, as the Movants contend it should have done, this Court still would have concluded that Houlihan Lokey's services would be duplicative.

    ii.     *Houlihan Lokey's proposed fees were not reasonable because the Committee*
                    *was in agreement with the Plan.*

Using a reasonableness standard, pre-approval of a fee pursuant to § 328(a) depends on the

totality of the circumstances. *Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. of*

*Unsecured Creditors (In re Smart World Techs., LLC)*, 552 F.3d 228, 234 (2d Cir. 2009).  Here,

Howley specifically informed the Court that the Committee was in agreement with the Plan and the

treatment afforded to the noteholders.  Indeed, because the Committee supported the Plan, the

Committee necessarily would have been aligned with the Debtor at any cramdown confirmation

hearing, and therefore would have necessarily assisted the Debtor in convincing this Court that the

Parkman Whaling valuation was correct.[24]  Therefore, once again, even if this Court had applied

solely the reasonableness standard requested by the Movants, this Court would still have concluded

that Houlihan Lokey's services would be duplicative and therefore unnecessary.

---

[24]  At the July 15 hearing, the Committee failed to make a record sufficient to convince this Court that yet a
third appraisal was necessary.  Indeed, Howley had represented to the Court that the Committee was "on board with .
. . the plan and the treatment afforded the noteholders."  [July 15, 2009 Tr. 69:19–20.]  Given this alignment, the
Committee necessarily would have had to join the Debtor at the confirmation hearing to convince this Court that the
Parkman Whaling valuation was more accurate than the Birch Run valuation.  Parkman Whaling is a capable and
competent investment banking firm, and the Committee has never contended otherwise.  Thus, at the July 15 hearing,
the Committee needed to make a record as to why it was necessary—i.e., reasonable—for this Court to approve the
proposed retention of Houlihan Lokey, the major purpose of which was to produce yet another appraisal that the
Committee no doubt hoped would show that the Debtor had no equity.  Indeed, given the enormous, nonrefundable fee
proposed to be paid to Houlihan Lokey, the Committee needed to adduce adequate testimony showing why Houlihan
Lokey's services were necessary.  For example, the Committee needed to adduce testimony that adequately explained
why it was not "on board" with Parkman Whaling's valuation.  Did the Committee believe that Parkman Whaling was
not qualified to do the appraisal that it did?  Did the Committee believe that Parkman Whaling's report failed to take into
account certain issues that Houlihan Lokey would cover?

c.     **If the Court had approved the proposed fees under 11 U.S.C. § 328(a), the improvident standard would bar disgorgement because on July 15, it was foreseeable that all parties in this case would negotiate a settlement resulting in a consensual Plan.**

The Movants argue that the "improvident standard" for 11 U.S.C. § 328(a) would allow modification of the fee arrangement even if this Court approved the proposed retention of Houlihan Lokey. In the Fifth Circuit, the rule for determining whether the improvident standard applies is whether there are intervening circumstances that were incapable of anticipation by the bankruptcy court. *In re Barron* 325 F.3d at 694. In *Barron*, the court noted that "[the attorney] was willing to work on a one-third (1/3) contingency basis of the amount recovered in the filing of any preferential and/or fraudulent complaints." *Id.* at 691. Parties objected to the appointment because of the high potential for collection. *Id.* The court, however, approved the retention because of the likelihood of litigation. *Id.* Subsequently, the attorney was able to win a summary judgment motion after only three depositions. *Id.* at 692. Thereafter, the bankruptcy court reduced the attorney's award because of the ease in which the judgment was collected. The district court affirmed. *Id.* The Fifth Circuit reversed, however, noting that the ease of collection could be anticipated. *Id.* at 694. Specifically, it is foreseeable that an engagement could turn into a "slam dunk" for the applicant because the matter being handled settles or resolves easily. *Id.* at 693–94. Indeed, counsel for Houlihan Lokey in *In re Mirant Corp.*, 354 B.R. 113  (Bankr. N.D. Tex. 2006) reminds the court that "even had [Houlihan Lokey] done no work whatsoever to earn its fees, it would be entitled to the success fee

for which it negotiated." *Id.* at 128. This Court is certainly capable of anticipating that the Debtor

could settle quickly, leaving Houlihan Lokey with $500,000.00 for very little work.[25]

> **d.    Even if Houlihan Lokey's fees were deemed reasonable under this Court's conclusions of law in the Opinion and the reasonableness standard advocated by the Movants, the proposed fees would be denied due to lack of adequate protection.**

Finally, the sheer weakness of the Motion to Amend is its failure to address the adequate

protection issue—a losing argument for the Movants from the very outset. The Movants knew that

the fees to be paid to Houlihan Lokey constituted cash collateral. *Energy Partners*, 2009 WL

2366104, at *19. Yet, at the July 15 hearing, the Movants neither adduced any testimony nor

introduced any exhibits showing how adequate protection would be provided to the Bank. Even if

the Court had made no other findings, the Movants would lose on lack of adequate protection alone.

*Id.* ("Accordingly, the lack of adequate protection provides this Court with an additional, and

independent, reason for denying the Applications."). Proving how a secured creditor is adequately

protected, such as the Bank, is such a fundamental requirement of the Bankruptcy Code that to

request an up-front, nonrefundable fee of $500,000.00 out of the Debtor's cash collateral without

mentioning adequate protection is audacious. Accordingly, this Court made no manifest error of law

in the Opinion when it concluded that the Bank was not adequately protected. Further, given the

utter failure to address the adequate protection issue, this Court made no manifest error of fact in the

Opinion when it characterized Houlihan Lokey as being a greedy hog.

---

[25] Indeed, on July 24, 2009, this Court held a status conference regarding this case. Counsel for the Debtor disclosed that the Debtor had negotiated an agreement with the Equity Holders' Committee, and that the Equity Holder's Committee would be supporting confirmation of the Plan. [July 24, 2009 Tr. 6:17–20.]

## IV. CONCLUSION

The Movants assert that this Court "incorrectly impugned Houlihan Lokey's integrity, credibility and motives." [Docket No. 386, p. 3, ¶ 2.] The Movants therefore filed the Motion to Amend in an effort to convince this Court to modify its findings of fact and conclusions of law set forth in the Opinion. The Movants, however, have failed to satisfy any of the requirements imposed by Rule 59(e) to make an amendment. The Movants presented no evidence whatsoever in conjunction with the Motion to Amend; they adduced no testimony and introduced no exhibits. Therefore, as support for the requested amendment, this Court has nothing in the record different from the record made on July 15. This Court wants to emphasize that the Movants, as is true with any party whose requested relief is opposed by another party, must focus on making a record through adducing testimony and introducing exhibits. Counsel making arguments from the podium is no substitute for hard evidence.

The Motion to Amend failed to improve the inadequate record made on July 15. Thus the Movants, through the arguments made in the Motion to Amend, failed to clearly establish that the Opinion contains a manifest error of fact or law. To establish a manifest error of fact or law requires more than resting on a party's previous conclusory testimony.

In the Opinion, this Court noted that the Fifth Circuit stated "[a]s the finder of fact, the bankruptcy court has the primary duty to distinguish hogs from pigs." *In re Swift*, 3 F.3d at 930. That is exactly what this Court did based upon the record made at the July 15 hearing. The Movants, by merely filing the Motion to Amend, but adducing no testimony and introducing no exhibits, have failed to persuade this Court that a manifest error of fact or law has occurred.

In sum, given the Fifth Circuit's admonition that a Rule 59(e) amendment is an extraordinary remedy with standards favoring denial, and given the paucity of a record in the case at bar, this Court must decline the relief sought by the Movants.  Accordingly, the Motion to Amend should be denied. An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.

Signed on this 15th day of September, 2009.

Jeff Bohm
United States Bankruptcy Judge