

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
12/31/2009

In re:                              §
                                    §
ENERGY PARTNERS, LTD., et al.,      §        Case No. 09-32957-H4-11
                                    §
Debtors.                            §

## MEMORANDUM OPINION REGARDING APPLICATION OF BIRCH RUN CAPITAL PARTNERS, LP AND RESOURCE MANAGEMENT, INC. AS MEMBERS OF THE OFFICIAL COMMITTEE OF EQUITY HOLDERS OF ENERGY PARTNERS, LTD., ET AL., FOR REIMBURSEMENT OF EXPENSES PURSUANT TO SECTIONS 503(b)(3)(D) AND 503(b)(3)(F) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2016
[Docket Nos. 462 & 484]

### I. INTRODUCTION

Prior to the formation of the Official Committee of Equity Holders (the Equity Committee) in this case, Birch Run Capital Partners, LP (Birch Run), an equity security holder, retained the law firm of Fulbright & Jaworski LLP (F&J) to represent it.[1]  F&J did, in fact, provide representation for approximately two weeks.  Then, the Equity Committee was formed; Birch Run became a member of the Equity Committee; F&J's representation of  Birch Run ceased; and the Equity Committee retained the law firm of Andrews Kurth LLP to represent the Equity Committee in the case.

During its two week representation of Birch Run, F&J performed legal services totaling $60,047.50 and incurred expenses of $1,432.90—for a total amount of $61,480.40.  After rendering these legal services, F&J sent an invoice to Birch Run for the amount of $61,480.40.  Birch Run now

---

[1] The style of this Chapter 11 case is "Energy Partners, Ltd., et al.," and Energy Partners, Ltd. is one of the entities that filed a Chapter 11 petition on May 1, 2009.  The other affiliated debtor entities that filed on May 1, 2009—which were all subsidiaries of Energy Partners, Ltd.—are Delaware EPL of Texas, LLC; EPL of Louisiana, L.L.C.; EPL Pioneer Houston, Inc.; EPL Pipeline, L.L.C.; and Nighthawk, L.L.C.   Hereinafter, all of these debtor entities are collectively referred to as the "Debtor."

seeks reimbursement for the entire $61,480.40 pursuant to 11 U.S.C. §§ 503(b)(3)(D) and (b)(4).

The Debtor objects to Birch Run's request on the sole ground that Birch Run did not provide a substantial contribution to this case as required by 11 U.S.C. § 503(b)(3)(D).

This Memorandum Opinion sets forth the reasons why this Court concludes that: (1) Birch Run did make a substantial contribution; and (2) Birch Run should receive reimbursement, but not to the extent that it has requested.

## II. THE PLEADINGS CREATING THE DISPUTE AT BAR

On September 30, 2009, Birch Run filed its Application as Members of the Official Committee of Equity Holders of Energy Partners, Ltd., et al., for Reimbursement of Expenses Pursuant to Sections 503(b)(3)(D) and 503(b)(3)(F) of the Bankruptcy Code and Bankruptcy Rule 2016[2] (the Application). [Docket No. 462.]  On October 23, 2009, the Debtor filed its Limited Objection to the Application (the Objection). [Docket No. 484.]   On October 28, 2009, this Court held a hearing on, among other matters, the Application and the Objection thereto.

## III. CREDIBILITY OF WITNESSES AND EXHIBITS INTRODUCED

Three witnesses testified at the October 28, 2009 hearing: (1) Thomas B. Hensley, Jr. (Hensley), a financial advisor for the Debtor; (2) Daniel Beltzman (Beltzman), Birch Run's managing partner; and (3) Zack A. Clement (Clement), the F&J partner in charge of the Birch Run representation.  The Court finds that all three of these witnesses gave very credible testimony.[3]  The

---

[2] Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

[3] Hensley and Beltzman, in addition to giving testimony about the services rendered by F&J, also gave testimony about certain other fees and expenses incurred by Birch Run and another member of the Equity Committee (Resource Management, Inc.) to which the Debtor does not object.  The total amount of these unobjected to fees and expenses is $2,380.19.  The Court concludes that these fees and expenses are reimbursable under 11 U.S.C. § 503(b)(3)(F).

Debtor called no witnesses of its own to controvert the testimony of Birch Run's witnesses.

Birch Run introduced five exhibits at the October 28, 2009 hearing. All five of these exhibits were admitted without objection. The exhibits are all pleadings that had been filed in this case. *See* Docket Nos. 212, 222, 380, 209, & 462.

### IV. FINDINGS OF FACT

1.  On May 1, 2009, the Debtor filed a voluntary Chapter 11 petition. [Docket No. 1.]

2.  On May 15, 2009, the Debtor filed its initial disclosure statement (the Initial Disclosure Statement) [Docket No. 134] and initial plan (the Initial Plan) [Docket No. 136]. The Initial Plan proposed to essentially wipe out the interests of the Debtor's common stockholders. The Initial Disclosure Statement included discussion of a valuation done by Parkman Whaling LLC (Parkman Whaling), the financial advisor to the Debtor. The Parkman Whaling valuation concluded that the Debtor's liabilities exceeded its assets.

3.  On June 3, 2009, Birch Run, a holder of the Debtor's common stock, engaged F&J to represent Birch Run in this case. F&J proceeded to represent solely Birch Run. F&J's fee agreement with Birch Run required Birch Run to pay a fee of $50,000.00 to F&J.[4]  Once retained, F&J had to work quickly in this large Chapter 11 case to properly represent Birch Run, including meeting the deadline for filing an objection to the Initial Disclosure Statement. [Clement Testimony, Tape recording, Oct. 28, 2009 at 12:11 p.m.] The invoice

---

[4] When asked by counsel for the Debtor whether Birch Run had paid F&J's fees, Clement, the partner at F&J in charge of the Birch Run file, testified that "Birch Run has paid us $50,000.00." Counsel for the debtors then asked, "What about the remaining amount?" Zack Clement responded, "That was the agreed upon fee." [Tape recording, Oct. 28, 2009 at 12:17 p.m.] The Court interprets this testimony to mean that when Birch Run retained F&J, the terms of the engagement were that (a) Birch Run had to remit $50,000.00 to F&J; (b) F&J would bill on an hourly basis; (c) if the value of the services exceeded $50,000.00, then Birch Run would not need to remit the difference; and (d) if the value of the services did not exceed $50,000.00, then F&J would return the difference to Birch Run.

that F&J sent to Birch Run reflects that the personnel of F&J who provided services for Birch Run spent, in the aggregate, 112.50 hours on this matter. [Exhibit C to Birch Run Ex. No. 5.]

4.      On June 8, 2009, Birch Run filed its Objection to the Initial Disclosure Statement (the Birch Run Objection).[5] [Docket No. 209.]   Among other things, Birch Run objected to the valuation of the Debtor prepared by Parkman Whaling and asserted that Parkman Whaling's valuation was inaccurate and outdated.  [Docket No. 209, ¶¶ 3–5.] According to Birch Run, which had done its own valuation, the Debtor's assets exceeded its liabilities by approximately $212 million.  Birch Run therefore requested that the Initial Disclosure Statement be denied and that the Debtor be required to include in any amended disclosure statement discussion of the Birch Run valuation.

5.      On June 8, 2009, Johnathan Bolton (Bolton), one of the attorneys at F&J, conferred with Stephan Statham (Statham), an attorney for the U.S. Trustee, about the Birch Run Objection.

---

[5] The name of the entity on the written pleading was Birch Run Capital, LLC. This name is different from the name of the entity that filed the Application; that entity's name is Birch Run Capital Partners, LP. The record from the hearing on the Application is devoid of any distinction between these two entities. In the Birch Run Objection, Birch Run Capital, LLC is represented to be the "investment manager for a Holder of Class 8 EPL Common Stock Interests." [Docket No. 209, p. 1.] In the Application, Birch Run Capital Partners, LP is described as a member of the Equity Committee, which means that this entity actually owned stock of the Debtor (as testified to by Beltzman at the hearing on the Application) as opposed to being the investment manager for a stockholder. F&J's invoice (which is part of the record) reflects that the client is simply "Birch Run Capital"—which could be a short-hand reference to either Birch Run Capital, LLC or Birch Run Capital Partners, LP. No party has objected to the Application on the grounds that Birch Run Capital Partners, LP lacks standing and that the party that should be filing the Application ought to be Birch Run Capital, LLC—and this Court is not *sua sponte* going to raise any standing issue of Birch Run Capital Partners, LP to file the Application. The Court does want to note, however, that for purposes of accuracy, the Birch Run Objection was filed not by Birch Run Capital Partners, LP, but rather by Birch Run Capital, LLC. Because neither the Debtor nor any other party in this case argued that this Court ought to analyze the distinction between these two entities when assessing whether Birch Run Capital Partners, LP made a substantial contribution in this case, the Court will treat all of the actions taken by Birch Run Capital, LLC as if these actions were taken by Birch Run Capital Partners, LP. In sum, hereinafter, in this Memorandum Opinion, reference to actions taken by or on behalf of "Birch Run" means reference to any actions taken by or on behalf of either "Birch Run Capital, LLC" or "Birch Run Capital Partners, LP." Finally, even if this Court is incorrect in so doing, the testimony at the hearing on the Application supports the conclusion that Birch Run Capital Partners, LP, as opposed to Birch Run Capital, LLC, provided a substantial benefit in this case.

[Exhibit C to Birch Run Ex. No. 5.]

6.  On June 9, 2009, the Debtor filed its first amended disclosure statement and first amended joint plan of reorganization. [Docket No. 212.] As with the Initial Disclosure Statement and the Initial Plan, these newly filed pleadings once again reflected that the interests of the Debtor's common stockholders would be cancelled if the plan was confirmed.

7.  On June 9, 2009, Bolton conferred again with Statham about the appointment of the Equity Committee. Bolton also communicated with other attorneys about soliciting other equity holders to form the Equity Committee. [Exhibit C to Birch Run Ex. No. 5.]

8.  On June 10, 2009, this Court held a hearing on whether to approve the Debtor's Initial Disclosure Statement, as amended on June 9, 2009, and on the Birch Run Objection. The Debtor's counsel vigorously asserted that this Court should overrule the Birch Run Objection, and F&J just as vigorously argued that the Court should sustain the Birch Run Objection. The Court found the Birch Run Objection to be meritorious and, accordingly, sustained the Objection. The Court required the Debtor to amend the Initial Disclosure Statement to include discussion about the Birch Run valuation so that the holders of the Debtor's common stock could adequately assess the Debtor's proposed plan pending at that time—which proposed to essentially wipe out all of their interests. The Court expressed the view that because the Birch Run valuation asserted that there was equity in the Debtor, whereas the Parkman Whaling valuation asserted that there was no equity in the Debtor, the goal of adequate disclosure for plan voting purposes would be more fully realized if the Debtor was required to amend its disclosure statement to provide discussion of the Birch Run valuation.

5

9.      On June 10, 2009, Bolton once again conferred with Statham regarding the appointment of

the Equity Committee.   [Exhibit C to Birch Run Ex. No. 5.]

10.     On June 11, 2009, Clement, the F&J partner in charge of representing Birch Run, provided

services with the objective of forming the Equity Committee.   [Exhibit C to Birch Run Ex.

No. 5.]

11.     On June 11, 2009, the Debtor filed its Second Amended Joint Plan of Reorganization (the

Second Amended Plan), [Docket No. 223], and its Second Amended Disclosure Statement

(the Second Amended Disclosure Statement), [Docket No. 222]. Although the Debtor

vehemently disagreed with the Birch Run valuation, [Docket No. 222, pp. 89–90], Birch

Run's alternative valuation analysis was included in the Second Amended Disclosure

Statement pursuant to this Court's oral ruling at the June 10, 2009 hearing.[6] [Docket No.

222, pp. 78–84.] However, the Second Amended Plan did not change the proposed treatment

of equity security holders from the treatment proposed in prior filed plans; once again, their

interests were to be cancelled.

12.     On June 15, 2009, Bolton and Mark Worden (Worden), another attorney at F&J, conferred

about the formation of the Equity Committee.  This conference was the last legal service

provided by F&J to Birch Run. [Exhibit C to Birch Run Ex. No. 5.]

13.     On June 16, 2008, the Court signed an order approving the Second Amended Disclosure

Statement.  [Docket No. 231.]

14.     On June 29, 2009, the U.S. Trustee gave notice of its appointment of the Equity Committee.

---

[6] Subsequently, on June 19, 2009, the Debtor filed a Corrected Second Amended Disclosure Statement, and this document contained the same information about the Birch Run alternative valuation that was set forth in the Second Amended Disclosure Statement.  [Docket No. 252.]

[Docket No. 268.]   The members of the Equity Committee appointed by the U.S. Trustee were Birch Run, High Energy, LLC, and Michael G. Thompson Family Properties, LLC. The Court finds that the services provided by F&J on behalf of Birch Run in successfully prosecuting the Birch Run Objection—thereby causing the Debtor to amend the Initial Disclosure Statement to discuss the Birch Run valuation—stirred up sufficient interest among equity holders other than Birch Run such that it became possible to find three entities (one of which was Birch Run) to become members of the Equity Committee.

15.   By the time Birch Run became a member of the Equity Committee, F&J had ceased its representation of Birch Run; indeed, F&J provided services to Birch Run only from June 3, 2009 through June 15, 2009.  The law firm of Andrews Kurth LLP (A&K) became counsel for the Equity Committee, effective June 30, 2009.  [Docket No. 394.]

16.   On behalf of the Equity Committee, A&K provided extensive services and was heavily involved in the plan confirmation process, as evidenced by the fee applications that it submitted to this Court. [Docket Nos. 420 & 461.] Specifically, A&K's services included, among other services, the following: (a) communications with the attorneys for the Debtor, the Official Committee of Unsecured Creditors (OCUC), and the Official Committee of Unsecured Noteholders (OCUN) regarding plan confirmation issues; (b) proper valuation methods regarding the value of the Debtor; (c) legal and factual research on confirmation objection issues; (d) preparation of the objection to confirmation and the motion to designate noteholder votes; (e) settlement negotiations over the proposed plan; (f) review of the amended plan granting equity holders 5% of the common stock of the reorganized Debtor; (g) review of the confirmation order; and (h) attendance at the confirmation hearing.  The

Court finds that but for the services provided by A&K referred to immediately above, the interests of equity security holders would not have been represented in the plan confirmation process. The Court further finds that as a direct result of the services rendered by F&J on behalf of Birch Run, the momentum to form the Equity Committee substantially increased, which in turn led to the actual formation of the Equity Committee, which in turn led to the retention of A&K, which thereafter provided the services referenced above.

17.     On July 28, 2009, as a result of the negotiations that the Debtor's counsel conducted with A&K, among other attorneys for the various constituencies, the Debtor filed its Second Amended Joint Plan of Reorganization as Modified as of July 28, 2009 (the Joint Plan). [Docket No. 354.] In the Joint Plan, the proposed treatment of equity security holders was no longer to simply cancel out their interests, but rather was to issue to these holders 5% of the shares of the reorganized Debtor. [Docket No. 354, p. 22.] The Court finds that as a direct result of the services rendered by F&J on behalf of Birch Run, the momentum to form the Equity Committee substantially increased, which in turn led to the actual formation of the Equity Committee, which in turn led to the retention of A&K, which thereafter provided representation to look out for the interests of equity security holders. The Court further finds that but for the services provided by A&K, the equity security holders would not have been represented in the plan confirmation process, and the Debtor would not have amended its plan to issue 5% of the shares of the reorganized Debtor to the equity security holders.

18.     On August 3, 2009, the Court issued the order confirming the Joint Plan. [Docket No. 380.] Subsequently, the Joint Plan was modified, but such modifications were not material and, moreover, such modifications did not affect the treatment of the equity security holders; they

8

still received 5% of the common stock of the reorganized Debtor.

19.     In its capacity as an equity holder, Birch Run received its pro rata share of the common stock of the reorganized Debtor.  As of October 28, 2009 (i.e., the date of the hearing on the Application), the value of this newly issued stock was approximately $3.5 million.  The amount that Birch Run paid to acquire the stock of the Debtor prior to confirmation of the Joint Plan was approximately $2.25 million.  Therefore, as of October 28, 2009, Birch Run, if it sold its shares of stock in the reorganized Debtor, would generate a profit of approximately $1.25 million.  There is no question, and the Court so finds, that (a) Birch Run retained F&J to protect Birch Run's $2.25 million investment; (b) Birch Run initially invested in the Debtor to make a profit; and (c) Birch Run's actions throughout the case have always been aimed at generating a profit for itself.

20.     Under the Joint Plan, the equity holders received 5% of the shares of the reorganized Debtor. This treatment was significantly more favorable to the equity holders than the treatment that had initially been proposed—and that had been proposed up until the filing of the Joint Plan—by the Debtor.  Up until the filing of the Joint Plan, the proposed treatment for equity holders was that their shares in the Debtor were to be cancelled and they were to receive warrants, which meant that these equity holders, if they wanted to acquire stock in the reorganized Debtor, would have had to exercise the warrants and pay cash to acquire such stock.  However, due to the formation of the Equity Committee and its retention of A&K, negotiations occurred which led to the equity holders receiving 5% of the common stock of the reorganized Debtor in exchange for cancellation of their shares in the Debtor.  The Court finds that this treatment is more favorable than the initially proposed treatment because,

9

among other things, such treatment put the equity security holders on a *pari passu* position vis-a-vis the treatment of the senior noteholders and because the equity security holders would not have to pay cash to acquire common stock in the reorganized Debtor.  If the Debtor's Initial Plan had been confirmed such that the equity security holders would have received warrants, the Court finds that the equity security holders would have received substantially less favorable treatment than they actually ended up receiving under the Joint Plan.

21.    Soon after the Joint Plan was confirmed, the stock of the reorganized Debtor was listed on the New York Stock Exchange.

22.    The major objectives of the Debtor and its estate was to obtain confirmation of a plan as quickly and efficiently as possible in order to maximize the chances of the reorganized Debtor being able to: (a) be listed on the New York Stock Exchange; and (b) successfully preserve, rehabilitate, and enhance its oil and gas operations.  The Court finds that the Debtor and its estate were able to achieve these objectives by obtaining confirmation of the Joint Plan.  The Court further finds that the Debtor would not have been able to obtain confirmation of a plan of reorganization as quickly as it did if the Debtor would have had to proceed to obtain confirmation on a cramdown basis over the objection of the Equity Committee; or, if the Equity Committee had not been formed, over the objection of Birch Run.  The Court further finds that if the Debtor would have had to proceed to obtain confirmation of any plan on a cramdown basis over the objection of the Equity Committee (or, if the Equity Committee had not been formed, over the objection of Birch Run), then the Debtor's estate would have incurred legal fees and expenses significantly greater than the

Debtor actually incurred by obtaining confirmation of the Joint Plan on a consensual basis. The Court also finds that F&J's efforts on behalf of Birch Run—both in prosecuting the Birch Run Objection and in conducting communications with the U.S. Trustee—led to the formation of the Equity Committee, which in turn resulted in negotiations between the Equity Committee and the other constituencies, which then led to the filing of a consensual plan and, thereafter, a very expeditious and relatively inexpensive confirmation of a plan (i.e., the Joint Plan).

23.     The Joint Plan satisfies the dual objectives of the Bankruptcy Code because: (a) the Debtor received a discharge and was able to preserve its operations; and (b) all claims, including secured and unsecured claims, were paid in full.

## V. CONCLUSIONS OF LAW

### A.     Jurisdiction and Venue

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1).  This contested matter is a core proceeding for five separate and independent reasons.  First, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) because this dispute is governed by the confirmed Joint Plan.  Article XI of the confirmed Joint Plan expressly states that this Court "shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and this Plan, to the fullest extent permitted by law, including jurisdiction to . . . hear and determine all Professional Fee Claims and other Administrative Claims."  [Docket No. 439, pp. 37–39.]  There is no question that the claim sought by Birch Run is an administrative claim.  Second, this dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because the issue of whether

11

Birch Run is entitled to reimbursement concerns the administration of the Debtor's estate.[7]  Third, this dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) because the issue of whether Birch Run is entitled to reimbursement necessarily requires this Court to determine whether Birch Run has an allowed claim against the Debtor's estate—or, more accurately, against the reorganized Debtor now that the plan has been confirmed.[8]  Fourth, this dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O) because the issue of whether Birch Run is entitled to reimbursement from the reorganized Debtor is a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship."  Finally, this dispute is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Venue is proper pursuant to 28 U.S.C. § 1408(1).

---

[7] Because the Debtor's assets have revested under the terms of the Joint Plan, there is no longer any estate at this time.  Nevertheless, at the time F&J rendered the services on which Birch Run bases the Application, the Debtor's estate did exist; and any request for reimbursement for the value of these services—which is clearly what Birch Run is seeking in the case at bar—falls within the enumerated category of "matters concerning the administration of the estate."

[8] Because the Debtor's assets have revested under the terms of the Joint Plan, there is no longer any estate at this time.  Nevertheless, at the time F&J rendered the services on which Birch Run bases the Application, the Debtor's estate did exist; and any request for reimbursement for the value of these services—which is clearly what Birch Run is seeking in the case at bar—falls within the enumerated category of "allowance or disallowance of claims against the estate."

**B.**     **Birch Run's Request for Reimbursement**

**1.**     **Applicable Section and Rule**

With respect to its request for reimbursement of fees paid to F&J, Birch Run filed the

Application pursuant to 11 U.S.C. § 503(b)(3)(D) and Bankruptcy Rule 2016.  Bankruptcy Rule

2016(a) sets forth, in pertinent part, that:

> An *entity* seeking interim or final compensation for services, or reimbursement of
> necessary expenses, from the estate shall file an application setting forth a detailed
> statement of (1) the services rendered, time expended and expenses incurred, and (2)
> the amounts requested.

Fed. R. Bankr. P. 2016(a) (emphasis added).  Section 101(15) defines "entity" as including, among

others, a "person."  11 U.S.C. §  101(15).  Section 101(41) defines "person" to include, among

others, a "partnership."  11 U.S.C. § 101(41).  Birch Run, as a limited partnership, is therefore a

"person," which in turn means that Birch Run is an "entity" under Bankruptcy Rule 2016(a).

Therefore, Birch Run has standing to seek "reimbursement of necessary expenses" pursuant to Rule

2016.[9]

The statute governing the reimbursement request by Birch Run is § 503(b)(3)(D), which sets

forth, in pertinent part, that:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . .
> including—
>> . . . .
>> (3) the *actual, necessary expenses*, other than compensation and
>> reimbursement specified in paragraph (4) of this subsection, *incurred by*—
>>> . . . .
>>> (D) a creditor, an indenture trustee, an *equity security holder*, or a

---

[9] Because the Debtor's assets have revested under the terms of the Joint Plan, there is no longer any estate at
this time.  Nevertheless, at the time F&J rendered the services on which Birch Run bases the Application, the Debtor's
estate did exist; and any request for reimbursement for the value of these services—which is clearly what Birch Run is
seeking in the case at bar—is governed by Bankruptcy Rule 2016(a)'s language of "[a]n entity seeking . . . reimbursement
of necessary expenses, from the estate."

>committee representing creditors or equity security holders other than
>a committee appointed under section 1102 of this title, *in making a
>substantial contribution in a case under chapter 9 or 11 of this title*.

11 U.S.C. § 503(b)(3)(D) (emphasis added).  The Debtor does not dispute that Birch Run is an equity

security holder, nor does the Debtor dispute that, in retaining F&J to represent it, Birch Run incurred

actual and necessary expenses.  In the Objection, the only issue which the Debtor disputes is whether

Birch Run, in receiving the representation that it did from F&J, made a substantial contribution to

this Chapter 11 case.  [Docket No. 484, ¶ 20.]

### 2.    Review of the Meaning of Substantial Contribution

Substantial contribution is not defined in the Bankruptcy Code.  In *In re DP Partners, Ltd.*

*Partnership*, the Fifth Circuit stated that: "Finding no statutory definition and nothing in the entire

statutory scheme or legislative history to indicate a contrary intent, we abide by the canon that words

in a statute are to be given their 'ordinary, everyday' meaning."  *In re DP Partners, Ltd. P'ship*, 106

F.3d 667, 673 (5th Cir. 1997) (citing *Crane v. Comm'r*, 331 U.S. 1, 6 (1947)).  Accordingly, the Fifth

Circuit concluded that the term "substantial contribution" in § 503(b)(3)(D) means a contribution

that is "considerable in amount, value or worth."  *Id.* at 673 (citing Webster's Third International

Dictionary 2280 (4th ed. 1976)).  In the context of a Chapter 11 case, the Fifth Circuit has noted that

services provide a "substantial contribution" if the services "foster and enhance, rather than retard

or interrupt the progress of reorganization."  *Id.* at 672 (quoting *In re Consol. Bancshares, Inc.*, 785

F.2d 1249, 1253 (5th Cir. 1986)).

In  determining  whether  an  entity  has  provided  a  substantial  contribution  under  §

503(b)(3)(D), the Fifth Circuit has held that bankruptcy courts have broad discretion and that "[t]he

development of a more concrete standard of substantial contribution is best left on a case-by-case

basis." *Id.* at 673. The entity attempting to prove that it has made a substantial contribution must do so by a preponderance of the evidence. *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 193 (Bankr. S.D. Tex. 1992).

Because there is no statutory definition of "substantial contribution" and because the bankruptcy courts have broad discretion on this issue, courts have applied numerous tests to determine whether an applicant has provided a substantial contribution. The Honorable D. Michael Lynn, United States Bankruptcy Judge for the Northern District of Texas, very clearly and cogently discussed these factors at length in *In re Mirant*, 354 B.R. 113, 132–35 (Bankr. N.D. Tex. 2006). These factors include: (1) whether the services involved in the contribution provided a benefit to the estate; (2) whether the services involved in the contribution were undertaken just for the applicant alone or for the benefit of all parties in the case; (3) whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate; (4) whether the benefit conferred through the applicant's contribution exceeds the cost which the applicant seeks to assess against the estate; (5) whether the efforts of the applicant were duplicative of efforts undertaken by statutory fiduciaries; (6) whether the applicant profited from the situation or rather faced substantial loss if it had not undertaken the approach that it did; and (7) whether the applicant had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion which caused the debtor to incur costs or which delayed resolution of the case. *Id.* The Court now analyzes these factors to determine if Birch Run, in receiving the legal services that it did from F&J, made a substantial contribution to this case.

15

3.    **Applying Various Factors to Determine Whether Birch Run Made a Substantial Contribution**

   a.    **Factor #1:  Whether the services involved in the contribution provided a benefit to the Debtor's estate**

Courts have considered whether the services involved in the contribution provided a benefit to the estate.  *In re Consol. Bancshares*, 785 F.2d at 1253 (holding that "the principal test of substantial contribution is 'extent of benefit to the estate'").  As a direct result of the services rendered by F&J on behalf of Birch Run, the momentum to form the Equity Committee substantially increased, which in turn led to the retention of A&K, which thereafter provided representation to look out for the interests of equity holders. [Finding of Fact No. 17.]  By effectively representing the Equity Committee, A&K negotiated a consensual plan with the Debtor and all other constituencies (i.e., the Joint Plan). [Finding of Fact No. 17.]  Because the Joint Plan was a consensual plan, the Debtor was able to quickly and efficiently obtain confirmation of this particular plan; and by so doing, the Debtor and its estate were able to maximize the chances of the reorganized Debtor being able to: (a) be listed on the New York Stock Exchange; and (b) successfully preserve, rehabilitate, and enhance its oil and gas operations.  [Finding of Fact No. 22.]

Additionally, if the Debtor would have had to proceed to obtain confirmation of any plan on a cramdown basis over the objection of the Equity Committee (or, if the Equity Committee had not been formed, over the objection of Birch Run), then the Debtor's estate would have incurred legal fees and expenses significantly greater than the Debtor actually incurred by obtaining confirmation of the Joint Plan on a consensual basis.  Thus, F&J's services on behalf of Birch Run helped to stir up sufficient interest to form the Equity Committee, which then forced the Debtor, the OCUC, and the OCUN to recognize that they had to attempt to negotiate a consensual plan because otherwise,

the Equity Committee would vigorously prosecute an objection to the proposed plan and wage an extremely expensive fight over the value of the Debtor's assets and over the confirmability of the plan.[10] [Finding of Fact Nos. 17 & 22.] Stated differently, F&J's services provided the key spark that ignited the engines of consensual confirmation negotiations and doused the flames of enormous legal fees and expenses that the Debtor's estate would have otherwise incurred.

Finally, the Fifth Circuit has stated that in assessing whether an applicant has provided a substantial contribution, the bankruptcy courts "[a]t a minimum . . . should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate." *In re DP Partners*, 106 F.3d at 673. In the case at bar, Birch Run seeks to recover $61,480.40. This sum is a paltry percentage of the amount of fees and expenses saved by the Debtor's estate by avoiding a lengthy and expensive cramdown confirmation battle.

For all of the reasons set forth above, this first factor strongly supports the conclusion that Birch Run has made a substantial contribution in this case.

      **b.**     **Factor #2: Whether the services involved in the contribution were undertaken just for Birch Run alone or for the benefit of all parties in the case**

In the first instance, Birch Run retained F&J to file and prosecute the Birch Run Objection.

---

[10] The Debtor makes much of the fact that the Equity Committee never formally adopted the Birch Run valuation and argues that this fact supports the conclusion that Birch Run did not provide a substantial contribution. This Court disagrees. By doing its own valuation, and then successfully forcing the Debtor to discuss this valuation in the Second Amended Disclosure Statement, Birch Run helped to stir up enough interest to form the Equity Committee. The formation of the Equity Committee forced the Debtor to negotiate with the Committee knowing that if negotiations failed, the Equity Committee would oppose confirmation of the plan and would have at its disposal for introduction into evidence the Birch Run valuation showing that contrary to the valuation relied upon by the Debtor, the assets of the estate exceeded its liabilities; and that therefore any plan cancelling the interests of the equity holders would be unfair and inequitable under 11 U.S.C. § 1129(b). The fact that the Equity Committee never formally adopted the Birch Run valuation—and it is by no means clear to this Court what "formal adoption" means—would not have prohibited the Committee from introducing this particular valuation into evidence at any cramdown confirmation hearing. Counsel for the Debtor and the other constituent groups assuredly knew of and appreciated this possibility as they negotiated with the Equity Committee.

[Finding of Fact Nos. 3 & 4.] The major argument of this pleading was the following: (1) The Initial Plan proposed to wipe out all existing equity interests of the Debtor, which interests were placed into Class 8 under the proposed plan; (2) The Initial Disclosure Statement contained only the Parkman Whaling valuation, which (in Birch Run's view) incorrectly set forth that the Debtor's liabilities exceeded its assets; (3) Birch Run had done its own valuation, which concluded that the Debtor's assets exceeded its liabilities by approximately $212 million; and (4) Any disclosure statement should include the Birch Run valuation so that the equity interest holders would have adequate information to arrive at an informed decision in deciding whether to accept or reject the proposed plan. [Finding of Fact No. 4.] In successfully making this argument—the Court sustained the Birch Run Objection and required the Debtor to amend its disclosure statement to incorporate the Birch Run valuation [Finding of Fact No. 8]—Birch Run, through the services rendered by F&J, contributed not only to protecting Birch Run's interests, but also to protecting all similarly situated interests—i.e., the interests of all existing equity holders of the Debtor.

Additionally, a second argument of the Birch Run Objection was as follows: (1) The Birch Run valuation concluded that the Debtor's assets exceeded its liabilities by approximately $212 million; and (2) Because the Initial Plan proposed to cancel the interests of all equity security holders, the interests of these holders needed to be protected through the immediate appointment of an equity committee. [Finding of Fact No. 4; Birch Run Ex. No. 4.] In successfully making this argument—the U.S. Trustee appointed such a committee in the wake of this Court sustaining the Birch Run Objection [Finding of Fact No. 14]—Birch Run, through the services rendered by F&J, once again contributed not only to protecting Birch Run's interests, but also to protecting all similarly situated interests—i.e., the interests of all existing equity holders of the Debtor. Indeed,

the Equity Committee was instrumental in negotiating with the Debtor and other constituent groups (such as the OCUC and the OCUN) so that the Joint Plan that this Court eventually confirmed provided that existing equity holders of the Debtor would receive 5% of the common stock of the reorganized Debtor, treatment which was a vast improvement over the treatment that the equity holders would have received if the Initial Plan had been confirmed. [Finding of Fact Nos. 16, 17, & 20.]

Further, because Birch Run's efforts led to the formation of the Equity Committee [Finding of Fact No. 14]—which then negotiated a consensual plan (i.e., the Joint Plan) [Finding of Fact Nos. 16, 17, & 22]—not only did all equity holders benefit; all constituency groups benefitted because the substantial attorneys' fees and expenses that would have been incurred in a cramdown battle were, in fact, avoided. Thus, the Debtor's estate benefitted because these constituency groups did not then seek to recover from the estate what would have been terribly high fees and expenses.

In sum, Birch Run's efforts ended up benefitting not only Birch Run, but also all of the equity security holders of the Debtor. And, the benefit was significant: instead of having their common stock interests completely eliminated, the existing equity holders received 5% of the reorganized Debtor. Finally, Birch Run's efforts benefitted the estate because a consensual plan was negotiated, thereby minimizing the fees and expenses that the estate would otherwise have been responsible for paying. For all of these reasons, this second factor weighs heavily in favor of the conclusion that Birch Run provided a substantial contribution.

c.     **Factor #3: Whether Birch Run would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate**

There was no testimony adduced or exhibits introduced relating to the issue of whether Birch

19

Run would have retained F&J if it did not believe that the Debtor's estate would reimburse Birch Run for the fees it would have to pay to F&J. Accordingly, this factor neither favors nor disfavors a conclusion that Birch Run provided a substantial contribution.

      d.      **Factor #4: Whether the benefit conferred through Birch Run's contribution exceeds the cost which Birch Run seeks to assess against the estate**

Birch Run seeks to recover $61,480.40. [Birch Run Ex. No. 5, ¶ 9.] The issue, therefore, is how does this amount compare to the benefit conferred through Birch Run's contribution to this case. As already noted above, Birch Run's efforts benefitted the estate because a consensual plan was negotiated, thereby minimizing the fees and expenses that the estate would otherwise have been responsible for paying. And, while there is nothing in the record to indicate exactly how much the estate saved in fees and expenses that it would have incurred if the Debtor had attempted to obtain confirmation of a plan on a cramdown basis over the objection of either the Equity Committee or, if no Equity Committee had been formed, Birch Run, there is no question that the amount saved greatly exceeds the $61,480.40 now sought by Birch Run. *See In re McGuier*, 346 B.R. 151, 165 (Bankr. W.D. Pa. 2006) ("Finally, where the evidentiary record is inadequate, the reviewing court has authority to make an appropriate award without further pleadings or evidence relying on its own knowledge and experience in determining reasonable and proper fee awards."). The Court makes this conclusion because a cramdown confirmation hearing would have resulted, at a minimum, in several depositions of valuation experts and thereafter a multi-day plan confirmation hearing. Given that all constituent groups were represented by large law firms—each of whom had several attorneys working on the case with hourly rates in the high three figures—there is no question that the $61,480.40 sought by Birch Run would be an extremely small percentage of this figure. Thus, if this

fourth factor is to be analyzed solely through comparing the dollars saved by the estate versus the dollars requested by Birch Run, the benefit conferred through Birch Run's contribution greatly exceeds the amount which Birch Run seeks to recover.

However, "[a]lthough the amount to be allowed as an administrative expense must be measured in dollars and cents . . . the question whether the estate has been benefitted cannot be so narrowly confined. [The estate could receive] other less readily calculable benefits, such as the ability to continue to conduct business as usual." *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992), *cert. dismissed*, 507 U.S. 1048 (1993). Here, the less readily calculable benefit that Birch Run provided to the reorganization process is two-fold: (1) the twin pillars of bankruptcy were achieved: the satisfaction of valid claims against the estate, and allowing the debtor a "fresh start" in the market place [Finding of Fact No. 23]; *see In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd*, 116 F.3d 790 (5th Cir. 1997); and (2) the plan confirmation process was accomplished with great speed, which was a major objective of this particular Debtor as it sought to return to the New York Stock Exchange [Finding of Fact No. 22]. Indeed, the Debtor was able to obtain confirmation of a plan in a remarkably short period of time at a relatively low cost given the size and complexity of this case. The Debtor was able to do so because the Joint Plan was a consensual plan. If the Debtor had not been able to propose a consensual plan, but rather had to seek confirmation on a cramdown basis over the objection of the Equity Committee—or if the Equity Committee had not been formed, over the objection of Birch Run—then the Debtor would not have been able to obtain a confirmed plan in as expeditious and inexpensive a manner as it actually did. [Finding of Fact No. 22.] Birch Run, through the services of F&J, was instrumental in stirring up interest to form the Equity Committee, which in turn forced the Debtor and other constituency

21

groups to conduct serious negotiations that led to the consensual Joint Plan.  Thus, aside from a sheer

dollars and sense analysis, Birch Run's efforts, through the services provided by F&J, conferred a

benefit to the estate by directly forcing negotiations that led to a consensual plan.  By forcing such

negotiations, the consensual Joint Plan was confirmed very quickly, thereby allowing the reorganized

Debtor to be listed on the New York Stock Exchange much sooner than would have been the case

if the Debtor had had to seek confirmation on a cramdown basis.  [Finding of Fact No. 22.]

For the reasons set forth above, this fourth factor weighs heavily in favor of concluding that

Birch Run made a substantial contribution.

### e.  Factor #5: Whether the efforts of Birch Run were duplicative of efforts undertaken by statutory fiduciaries

The Court now examines whether the efforts of Birch Run, through the services provided by

F&J, were duplicative of those undertaken by statutory fiduciaries.  *In re Mirant*, 354 B.R. at 137

(citing *In re Consol. Bancshares, Inc.*, 785 F.2d at 1249);  *In re Consol. Bancshares, Inc.*, 785 F.2d

at 1249 (holding that the applicant was not entitled to an award of attorneys' fees as having made

a "substantial contribution" in a Chapter 11 case where, among other things, the applicant's efforts

were duplicative of those of an equity security holders' committee).  The Court concludes that the

services provided by F&J were not at all duplicative of the efforts undertaken by any statutory

fiduciaries.  Indeed, F&J's efforts were made solely in its capacity as counsel for Birch Run [Finding

of Fact No. 3], and these services were not duplicative of the services provided by any other party

or its counsel.  In the first instance,  F&J prosecuted the Birch Run Objection in order to convince

this Court that any approved disclosure statement in this case needed to contain discussion of the

valuation done by Birch Run showing that, contrary to the valuation provided by the Debtor's

professional, the Debtor's assets exceeded its liabilities.  [Finding of Fact No. 4.]  Birch Run was the only party-in-interest to prosecute its objection to the Initial Disclosure Statement, so F&J's efforts on behalf of Birch Run in this regard in no way was duplicative of efforts by other parties or their attorneys.

Second, F&J's efforts went toward stirring up interest in the formation of the Equity Committee.  [Finding of Fact Nos. 5, 9, & 10.]  There were no other equity holders who took such actions.  Therefore, F&J's efforts were not duplicative in this regard.

For these reasons, this fifth factor strongly weighs in favor of concluding that Birch Run provided a substantial contribution.

f.      **Factor #6: Whether Birch Run profited from the situation or rather faced substantial loss if it had not undertaken the approach that it did**

There is no question that Birch Run faced a substantial loss if it had not retained F&J and authorized F&J to take the action that F&J took—including drafting and prosecuting the Birch Run Objection and conferring with the U.S. Trustee, among others, to form the Equity Committee.  [Finding of Fact Nos. 4, 5, 8, 9, & 10.]  Indeed, Birch Run paid approximately $2.25 million to acquire stock in the Debtor [Finding of Fact No. 19]; and if the Initial Plan had been confirmed, Birch Run's shares of stock would have been cancelled and Birch Run would have lost its entire investment in the Debtor.  [Finding of Fact No. 20.]  Thus, Birch Run faced a substantial loss if it had not retained F&J.

There is also no question that Birch Run has profited from confirmation of the Joint Plan to the tune of approximately $1.25 million. [Finding of Fact No. 19.]  At least, that was the estimated profit as of October 28, 2009 given the then respective market prices of oil and gas.

In his *Mirant* opinion, Judge Lynn made the following comment about the post-petition actions of the applicant in his court (which actions seem to be similar to those of Birch Run in the case at bar):

> In awarding compensation, the court necessarily exercises its in rem, equitable jurisdiction. 1 Collier on Bankruptcy ¶ 2.09 (14th ed.1974). Equity is invoked by Courts to prevent injustice. *In re Multiponics, Inc.*, 622 F.2d 709, 721 (5th Cir. 1980). Thus, the thrust of section 503(b)(4) should be to prevent a creditor or interest holder from suffering greater loss from a debtor's bankruptcy than do its peers where that loss resulted from expenditures by the applying party that benefited [sic] those very peers. Given that Phoenix [i.e., the applicant] suffered no loss in the value of its investments by reason of Debtors' chapter 11 filings but rather profited from the situation through post-petition trading, the court believes its situation is different from a creditor who faced substantial loss due to a bankruptcy filing and stepped in to aid the process to the benefit of itself and others similarly situated. Phoenix is not such a sympathetic applicant. It chose to become involved with a bankrupt entity; if Phoenix expended funds to make that involvement profitable, it is more properly a cost of doing business for Phoenix than a charge to be borne by creditors and shareholders generally. *Although the court will not consider this dispositive of Phoenix's entitlement to recompense, it is a factor which must necessarily chill any impulse toward generosity.*

*In re Mirant*, 354 B.R. at 134–35 (emphasis added).

Beltzman testified at the October 28, 2009 hearing that Birch Run did not own any of the Debtor's stock as of May 15, 2009—i.e., fifteen days after the filing of the Debtor's petition, Birch Run owned no stock of the Debtor.  [Tape recording, Oct. 28, 2009 at 11:25 a.m.]  At some point after May 15, 2009, Birch Run acquired stock in the Debtor.  Because Birch Run purchased stock in the Debtor after this case was filed, Birch Run, like the applicant in *Mirant*, was involved in post-petition trading; in other words, that Birch Run intentionally injected itself into this Chapter 11 case after the filing of the petition.

Judge Lynn's comments above indicate that he believes that a bankruptcy court should, in evaluating a § 503(b) application, take into account—at least to some extent—the post-petition

actions of the applicant as these actions relate to generating a profit. The undersigned judge respectfully disagrees. In *DP Partners*, the Fifth Circuit stated that:

> The benefits, if any, conferred upon an estate are not diminished by selfish or shrewd motivations. We therefore hold that a creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has incurred actual and necessary expenses in making a substantial contribution to a case.

*In re DP Partners*, 106 F.3d at 673.

The undersigned judge interprets the Fifth Circuit's language to mean that any profit motive of the applicant should <u>not</u> be a factor in assessing whether the applicant provided a substantial contribution to the case.[11]

For these reasons, this Court concludes that the sixth factor has no relevance in coming to a conclusion as to whether Birch Run provided a substantial contribution to this case.

g.    **Factor #7: Whether Birch Run had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion which caused the debtor to incur costs or which delayed resolution of the case**

There is nothing in the record to indicate that Birch Run had a negative effect on the case. To the contrary, Birch Run had a positive effect on the case because, through the efforts of its counsel, F&J, Birch Run was instrumental in forming the Equity Committee, which then forced the Debtor and other constituencies to negotiate a consensual plan (i.e., the Joint Plan) that, among other positive results: (1) ensured that the interests of the equity holders were not entirely wiped out by allocating 5% of the reorganized Debtor's common stock to these holders [Finding of Fact No. 22];

---

[11] This Court would also note that in *Mirant*, Judge Lynn ultimately approved all of the attorneys' fees of the applicant who had profited from post-petition trading. *Mirant*, 354 B.R. at 138–39. Judge Lynn's ruling was consistent with his statement that the profit motive of the applicant would not be dispositive as to whether reimbursement would be approved. Judge Lynn obviously reviewed other factors in deciding to approve the reimbursement of attorneys' fees sought by that particular applicant.

(2) paid all unsecured claims in full [Finding of Fact No. 23]; (3) consummated exit funding that

paid off Bank of America, N.A. (the major secured creditor at the time of the filing of the Debtor's

petition) [Finding of Fact No. 23]; and (4) minimized professional fees for which the estate would

have been liable by avoiding what would have been a lengthy and hotly disputed cramdown plan

confirmation hearing [Finding of Fact No. 22].

For these reasons, the seventh factor strongly weighs in favor of concluding that Birch Run

provided a substantial contribution to this case.

### h.    Summary of the seven factors that this Court has analyzed regarding whether Birch Run made a substantial contribution

Of the seven factors, one of them—Factor #3—is inapplicable due to a lack of evidence.

Another—Factor #6—is irrelevant based upon Fifth Circuit case law. Of the remaining five factors,

all of them weigh heavily in favor of concluding that Birch Run made a substantial contribution.

Under these circumstances, the Court concludes that Birch Run made a substantial contribution in

this Chapter 11 case.

This conclusion, however, does not mean that Birch Run is now entitled to reimbursement

of the $61,480.40 that it has requested. There are two additional points on which this Court must

focus. First, Birch Run only had to pay $50,000.00 to F&J. [Finding of Fact No. 3.] Therefore, the

maximum amount for which Birch Run may be reimbursed under § 503(b)(3)(D) and Bankruptcy

Rule 2016(a) is $50,000.00, not the $61,480.40 that Birch Run has requested. Indeed, the Fifth

Circuit has made it clear that no litigant should be able to recover fees in excess of what the litigant

has actually paid. *See, e.g.*, *United States v. Claro*, 579 F.3d 452, 462 (5th Cir. 2009) ("In no event

. . . should the litigant be awarded a fee greater than he is contractually bound to pay."); *Johnson v.*

26

*Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974) ("In no event, however, should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount.").

The second point which this Court must address is § 503(b)(4). Because Birch Run seeks reimbursement for the fees and expenses of attorneys (i.e., F&J), Birch Run must also satisfy the requirements of 11 U.S.C. § 503(b)(4).[12]

### 4.    Review of Whether Birch Run has Satisfied the Requirements of § 503(b)(4)

Section 503(b)(4) provides that:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . including—
> . . . .
>> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(4).

The statute requires that Birch Run show that: (a) the compensation sought is reasonable; (b) the compensation is for services of an attorney or accountant; (c) the attorney or accountant be employed by an entity that is entitled to payment under § 503(b)(3)(D); and (d) the compensation and expenses must have been actually incurred by Birch Run. *In re Mirant*, at 132. There is no

---

[12] The Objection filed by the Debtor focuses on whether Birch Run provided a substantial contribution under § 503(b)(3)(D). The Objection does not discuss whether the requirements of § 503(b)(4) are satisfied, and counsel for the Debtor did not focus on these requirements during oral argument at the October 28, 2009 hearing. Nevertheless, this Court has an independent duty to ensure that the requirements of § 503(b)(4) are satisfied. *See, e.g.*, *In re White*, Case No. 401-42839-DML-13, 2002 Bankr. LEXIS 1949, at *5  (Bankr. N.D. Tex. Mar. 22, 2002) ("This Court has an independent duty to review fee applications."); *In re Zedda*, 169 B.R. 605, 607 (Bankr. E.D. La. 1994) ("The Court, of course, has an independent duty to determine the reasonableness of the application.").

question that the compensation for which Birch Run seeks reimbursement is for the services rendered by an attorney, which in this case is F&J. [Finding of Fact No. 3.] There is also no question that Birch Run is entitled to an administrative claim under § 503(b)(3)(D) because this Court has concluded, as set forth above, that Birch Run provided a substantial contribution to this case. And, there is no dispute that Birch Run incurred actual and necessary expenses because F&J did indeed provide legal services between June 3, 2009 and June 15, 2009. [Finding of Fact Nos. 3 & 15.] Thus, the second, third, and fourth requirements of § 503(b)(4) are satisfied. The remaining issue which this Court now addresses is whether the compensation for which Birch Run seeks reimbursement is reasonable.[13]

### a.      Whether the compensation is reasonable

In determining what is reasonable for attorneys' fees, bankruptcy courts must follow a three-step process outlined in *First Colonial*: (1) ascertain the nature and extent of the services supplied by the attorney with reference to the time records submitted; (2) assess the value of the services; and (3) briefly explain the findings and reasons upon which the award is based, including a discussion of how each of the twelve factors from *Johnson* affected the court's decision.[14]  *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1299–1300 (5th Cir. 1977).

With respect to the first step in the three-step analysis set forth in *First Colonial*, this Court has ascertained the nature and extent of F&J's services through a review of F&J's time records, attached as Exhibit C to Birch Run's Exhibit Number 5. F&J's time records indicate that three F&J

---

[13] Section 503(b)(4)'s requirement that the compensation be "reasonable" necessarily requires this Court to consider the time spent by F&J, the nature of F&J's services, the extent of F&J's services, the value of such services, and the cost of comparable services. *In re Mirant Corp.*, 308 Fed. Appx. 824, 828 (5th Cir. 2009); *In re Statepark Building Group, Ltd.*, 2005 Bankr. LEXIS 1248, at *11 (Bankr. N.D. Tex. 2005).

[14] *See Johnson*, 488 F.2d at 717–19.

attorneys (Clement, Bolton, and Worden) and two individuals whose job positions are not identified on F&J's time records (Casey Erin Mucha and Lisa Vigil) billed Birch Run for their professional services related to this matter.[15]   F&J charged Birch Run a total of $61,480.40, which includes $60,047.50 for 112.50 hours of work by the five F&J professionals and $1,432.90 in expenses and services including copy fees, local travel, meals, and color copy fees.  Of the 112.50 hours, much of this time was spent drafting and prosecuting the Birch Run Objection; there was also time spent pushing for the formation of the Equity Committee.  [Exhibit C to Birch Run Ex. No. 5.]  In many instances, however, the F&J personnel "lumped" activities in violation of the U.S. Trustee's Fee Guidelines,[16] and the Court is unable to discern how much time was allocated to these activities and the value of the services rendered by the particular person at F&J performing the services.

For example, on June 4, 2009, Bolton spent 9.25 hours performing seven discrete services, which are set forth verbatim below:

> Conference with Zack Clement regarding objection to disclosure statement; Read plan and disclosure statement; Conference with Zack Clement and Mark Worden regarding preparation of objection and draft of insert to disclosure statement; Review client's draft analysis of equity value; Draft Objection; Conference with Zack Clement concerning changes to same; Review Mark Worden's draft of insert to disclosure statement.

---

[15] Based upon the Court's experience, the Court concludes that Ms. Mucha and Ms. Vigil are legal assistants at F&J.

[16] *Available at* http://www.justice.gov/ust/eo/rules_regulations/guidelines/docs/feeguide.htm (reprinted at 28 C.F.R. Pt. 58, App. A).  Although these guidelines refer to applications filed under 11 U.S.C. § 330, the Court sees no reason why these guidelines should not equally apply to applications filed under § 503(b).  The specific language in these guidelines which this Court concludes is applicable in the case at bar is:
> Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour. Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a de minimis amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.

[Exhibit C to Birch Run Ex. No. 5.]

By way of another example, on June 4, 2009, Worden spent 9.5 hours performing five discrete services, which are set forth verbatim below:

> Analysis of memorandum regarding objection to disclosure statement; conference with Zack Clement and Johnathan Bolton regarding preparation of objection; analysis of disclosure statement and draft equity support analysis; telephone conference with Greg Smith, Daniel Beltzman, Zack Clement and Johnathan Bolton regarding strategy; preparation of draft insert for disclosure statement.

[Exhibit C to Birch Run Ex. No. 5.]

"When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the creditor has not met its burden to show that its fees are reasonable." *In re 900 Corp.*, 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005) (citing *In re Staggie*, 255 B.R. 48 (Bankr. D. Idaho 2000); *In re Ward*, 190 B.R. 242 (Bankr. D. Md. 1995) (stating that a percentage reduction in fees under section 506(b) is appropriate where tasks were lumped together in time entries)).

Unfortunately, of the twenty eight (28) entries that are on the F&J invoice, at least sixteen (16)—and arguably a few more than that—violate the U.S. Trustee's Guidelines prohibiting lumping. And, all of these entries are for substantial periods of time, ranging from 1.00 hours to 9.50 hours; thus, this is not an instance where, for example, there are multiple tasks done during a very short period of time (say, 0.50 hours or less). *See, e.g., In re Pan Am. Gen. Hosp., LLC*, 385 B.R. 855, 875 (Bankr. W.D. Tex. 2008) (awarding all of the requested fees despite lumping because "[w]hen blocks are relatively small, however, and when the total time spent on the block as a whole is minimal, allocating time to each task loses its convenience and utility"). There is nothing in the record to justify F&J's lumping of its time entries. Given the experience, expertise, and competence

30

of F&J personnel, this Court is at a loss to understand why there is lumping. Indeed, none of the fee applications of other major law firms in this case contain lumping to the extent that it exists in the F&J invoice.[17] It may well be that when the F&J personnel were recording their entries, none of them believed that Birch Run would eventually be seeking reimbursement under § 503 and that therefore they did not need to worry about lumping their time entries. If that is indeed what happened—and, once again, the Court wants to emphasize that there was no testimony given about this issue—then this explanation would still not suffice. It is simply not particularly time consuming to record the amount of time spent on each discrete service that is provided. The personnel at the other large law firms in this case have all taken this approach, and F&J should have done so.

The existence of lumping, however, does not mean that all of F&J's fees are *per se* unreasonable; this Court has wide discretion to simply reduce the amount of approved fees. *See, e.g., In re 900 Corp.*, 327 B.R. at 598; *In re Brous*, 370 B.R. 563, 576–77 (Bankr. S.D.N.Y. 2007); *Beatrice Cheese, Inc. v. Peter J. Schmidt, Inc. (In re Peter J. Schmidt, Inc.)*, 154 B.R. 632, 637–38 (Bankr. D. Del. 1993). Here, the very credible testimony from Clement is that F&J had to move extremely quickly to properly represent Birch Run [Finding of Fact No. 3]; and there is no question that F&J represented Birch Run with extreme competence and skill—indeed, even the Debtor acknowledges this point in footnote 7 to the Objection. Accordingly, the Court concludes that a reduction in the fees to be reimbursed should be made. The Court concludes that a reduction of 25% is appropriate. *See In re 900 Corp.*, 327 B.R. at 598 (The Honorable Barbara J. Houser reduced the requested fees by 25% due to lumping.).

---

[17] The following three major law firms in this case submitted fee applications and did not lump their time entries on their invoices:  Jones Day [Docket No. 500];  A&K [Docket No. 461]; and Vinson & Elkins LLP [Docket No. 513].

Regarding the second step in *First Colonial*, as already discussed, this Court concludes that the services F&J provided to Birch Run were highly valuable to this case.

Finally, as required by the third step in the *First Colonial* three-step analysis, this Court sets forth below its conclusions using the twelve factors set forth in *Johnson*.

### i.        Time and Labor Required

As already noted, F&J spent 112.50 hours on this matter.  [Finding of Fact No. 3.]  The lumping on F&J's invoice impedes, at least to some extent, this Court's ability to determine if the time spent on the particular tasks undertaken by F&J personnel is justified.  The Court concludes, however, that the entries, although lumped, are in sufficient detail to allow this Court to conclude that the services rendered by the F&J personnel were necessary and resulted in a substantial benefit for the estate.  Overall, the Court concludes that this factor weighs against concluding that all of the compensation for which Birch Run seeks reimbursement is reasonable; indeed, the Court has already concluded that it should reduce the requested reimbursement by 25% due to the lumping.

### ii.        Novelty and Difficulty of the Questions

Clement, on behalf of F&J, testified at the October 28, 2009 hearing that F&J had to work quickly on this large Chapter 11 oil and gas case when Birch Run told F&J that it believed the value of the Debtor was actually at least two-hundred million dollars higher than what was set forth in the Initial Disclosure Statement.  [Finding of Fact No. 3.]  Based upon this uncontroverted and credible testimony, the Court concludes that the issues confronted by F&J, although not novel, were unusually difficult.  Therefore, this factor weighs in favor of concluding that the compensation for which Birch Run seeks reimbursement is reasonable.

### iii.    Skill Required to Perform the Legal Services Properly

The legal services provided by F&J required skills in bankruptcy. All three F&J attorneys who provided services to Birch Run have expertise in bankruptcy and displayed their competence in this case. The Court therefore concludes that this factor weighs in favor of a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### iv.    Preclusion of Other Employment Due to Acceptance of the Case

F&J's time records indicate that the acceptance of this case required F&J professionals to devote time to this matter from June 3, 2009 through June 15, 2009. [Exhibit C to Birch Run Ex. No. 5.] There is nothing in the record indicating that F&J had to refuse employment in other matters by accepting the representation of Birch Run. Accordingly, this factor neither favors nor disfavors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### v.    Customary Fee

At the October 28, 2009 hearing, Clement testified that the rates and fees charged to Birch Run are reasonable rates for a bankruptcy case such as this and are also commensurate with rates charged for such a matter by similarly experienced attorneys in the Southern District of Texas. [Tape recording, Oct. 28, 2009 at 12:14 p.m.] The F&J professionals' hourly rates are as follows: Clement: $850.00; Bolton: $450.00; Worden: $395.00; Casey Erin Mucha: $95.00; and Lisa Vigil: $70.00. Given the educational backgrounds and experience of these individuals, this Court concludes that F&J's hourly rates are commensurate with those charged by similarly experienced attorneys in the Souther District of Texas. Indeed, a comparison of the hourly rates of F&J's personnel to the hourly rates of the personnel of other large law firms in this case underscores that F&J's rates are comparable; in fact, the rates of its legal assistants are considerably lower than the

rates of most other legal assistants at the other firms. Accordingly, the Court concludes that this factor weighs in favor of a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### vi.   Whether the Fee is Fixed or Contingent

F&J did not undertake its representation of Birch Run on a contingency basis. Rather, F&J received $50,000.00 for taking on the representation. [Finding of Fact No. 3.] It is not entirely clear to this Court whether F&J agreed to take on the representation for a flat fee of $50,000.00, or whether F&J agreed that the maximum fee would be $50,000.00, but that F&J would return to Birch Run a portion of the $50,000.00 if it turned out that the value of F&J's services fell below $50,000.00. Thus, it is possible that the fee was fixed at $50,000.00, but it is also possible that the fee was the lower of (a) the value of the services rendered by F&J; or (b) $50,000.00. As it turned out, the value of F&J's services was $60,047.50, and therefore it appears that based upon Clement's testimony that the $50,000.00 "was the agreed upon fee," F&J must "swallow" the amount of $10,047.50. [Finding of Fact No. 3.] These circumstances neither favor nor disfavor a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable with one caveat: whatever amount Birch Run is entitled to, it is not entitled to reimbursement exceeding $50,000.00.

### vii.   Time Limitations Imposed by the Client or Other Circumstances

When Birch Run retained F&J, there were time limitations. At the October 28, 2009 hearing, Clement testified that F&J had to work quickly in this large Chapter 11 case to properly represent Birch Run, including meeting the deadline for filing the Birch Run Objection. [Finding of Fact No. 3.] Accordingly, this factor strongly favors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

34

### viii.    Amount Involved and the Results Obtained

There is no question, and the Court so concludes, that F&J, in representing Birch Run, obtained a substantial benefit for not only Birch Run, but also for the Debtor's estate and other equity holders similarly situated to Birch Run.  F&J's efforts in prosecuting the Birch Run Objection and in conducting communications with the U.S. Trustee led to the formation of the Equity Committee, which thereafter resulted in the negotiated, consensual Joint Plan among all constituencies.  [Finding of Fact No. 22.]  Under these circumstances, a very expeditious and inexpensive plan confirmation was made possible.  The Court concludes that a better result could not have been achieved.  Further, the amount involved—i.e., the $61,480.40 in fees and expenses requested by Birch Run—is not by any means out of line given the superb results that were obtained.  Accordingly, this factor favors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### ix.    Experience, Reputation, and Ability of the Attorney

Clement has over thirty years of experience as an attorney.  Clement is a seasoned and capable bankruptcy attorney.  Worden is a senior associate at F&J and holds a MBA.  Beltzman testified that Worden's MBA helped bridge the gap between the financial and legal concepts.  [Tape recording, Oct. 28, 2009 at 11:33 a.m.]  Beltzman also testified that Bolton, a senior associate at F&J, was very involved with the Birch Run Objection and coordinated with the U.S. Trustee regarding the formation of the Equity Committee.  [Tape recording, Oct. 28, 2009 at 11:34 a.m.]  Accordingly, this factor strongly favors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### x.  "Undesirability" of the Case

The circumstances of this case make this case no more or less desirable than other large Chapter 11 cases. Accordingly, this factor neither favors nor disfavors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### xi.  Nature and Length of the Professional Relationship with the Client

F&J's representation of Birch Run began on June 3, 2009 and ended on June 15, 2009, as shown on F&J's time records. [Finding of Fact No. 15]; [Exhibit C to Birch Run Ex. No. 5]. There is nothing in the record indicating that Birch Run and F&J have a long-standing professional relationship. The Court concludes that the factor neither favors nor disfavors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

### xii.  Awards in Similar Cases

There is nothing in the record addressing this particular factor. Accordingly, the Court concludes that this factor neither favors nor disfavors a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable.

A review of the twelve factors indicates that six favor a conclusion that the compensation for which Birch Run seeks reimbursement is reasonable; one favors a conclusion that the requested compensation is unreasonable; and the other five tip the scales in neither direction. Under these circumstances, the Court concludes that the compensation for which Birch Run seeks reimbursement is reasonable so long as a reduction of 25% is made for the lumping in F&J's time entries.

### VI. CONCLUSION

In sum, for all the reasons set forth herein, the Court concludes that: (1) Birch Run provided

a substantial contribution to this Chapter 11 case under 11 U.S.C. § 503(b)(3)(D); (2) Because Birch

Run provided a substantial contribution, it is entitled to a reimbursable administrative claim; (3)

Because Birch Run's reimbursement request is entirely for the fees of attorneys (i.e., F&J), Birch

Run must show that pursuant to § 503(b)(4), F&J's fees are reasonable; (4) The fees charged by F&J

are reasonable, but only if they are reduced by 25% due to the lumping that is in the time entries of

F&J; (5) Because Birch Run paid F&J a total amount of $50,000.00, Birch Run is not entitled to be

reimbursed in the requested amount of $61,480.40, but rather is entitled to be reimbursed, at most,

for the $50,000.00 that it actually paid to F&J; and (6) A reduction of 25% of the $50,000.00 is

$12,500.00, which results in a reimbursable administrative claim of $37,500.00.

An order requiring the reorganized Debtor to reimburse Birch Run for this reimbursable

administrative claim of $37,500.00 will be entered on the docket simultaneously with the entry on

the docket of this Memorandum Opinion.

Signed on this 31st day of December, 2009.

_____
Jeff Bohm
United States Bankruptcy Judge